1    Vincent Palomo
      Department of Corrections
2    P.O. Box 3236
      Hagåtña, Guam 96932
3
    pro se
4

```
ORIGINAL
      FILED
DISTRICT COURT OF GUAM
    MAR 1 7 2004
  MARY L. M. MORAN
   CLERK OF COURT
```

# UNITED STATES DISTRICT COURT
## DISTRICT OF GUAM

7   VINCENT PALOMO,            Civil Case No. **04-00013**

8              Plaintiff,

9     vs.

10   FRANK ISHIZAKI, individually and as
     Director of Corrections; &         CIVIL RIGHTS COMPLAINT
11   CAPT. JESSE TUPAZ, individually and as
     Acting Superintendent;
12
             Defendants.
13  _____/

14

15       This is a §1983 action filed by Vincent Palomo, an inmate of the Department of Corrections,

alleging violations of his constitutional due process and equal protection rights and seeking

16 compensatory and punitive damages from defendants in their individual capacities as well as a

17 declaratory judgement, and injunctive relief in their individual and official capacities. The plaintiff

18 requests a trial by jury.

19                     JURISDICTION

20 1.     This is a civil rights action under 42 U.S.C. §1983. This Court has jurisdiction under 28

21 U.S.C. §1343 and in accordance with the provisions of Title 48 §1424. Plaintiff also invokes the

22 pendent jurisdiction of this Court.

23                     PARTIES

24 2.     Plaintiff Vincent Palomo is presently incarcerated at the Department of Corrections (D.O.C.)

25 in Mangilao, Guam.

26

27

28

3.     Defendant Frank Ishizaki, was formerly the Director of D.O.C. and was responsible for it's administration and management at the time of the allegations related herein. He is sued in his individual and official capacities.

4.     Defendant Jesse Tupaz was the Acting Prison Security Administrator (P.S.A.) or Warden of D.O.C. at the time of the allegations related herein. He is sued in his individual and official capacities.

## FACTS

5.     Each and all of the acts of defendants alleged herein were done by defendants, and each of them, under the color and pretense of the statutes, regulations, customs, and usages of Guam, and under the color of authority of their offices as director and warden.

6.     On 21 April 2003 plaintiff, then a Medium Custody Classification Level 3 inmate, was placed in pre-hearing detention in Post #6 Special Housing Unit (S.H.U.), for alleged violations of Executive Order 94-19 "Rules and Regulations for the Administration of Correctional Institutions and Other Places of Confinement" (E.O. 94-19), which resulted from a heated conversation with a Corrections Officer, who is not a party to this action. Plaintiff was charged with violations of §3.5 Code 113 "Threatening another with serious harm," §3.6 Code 212 "Insolence towards a staff member," and §3.7 Code 329, entitled "Using abusive or obscene language or gestures to a staff member." The Code 113 violation is categorized under §3.5 entitled, "Greatest Misconduct Category." (See Appendix.)

7.     In a hearing of the Disciplinary Hearing Board (D.H.B.) on 25 April 2003, in D.H.B. case number DHB2003-04-055, plaintiff voluntarily pled guilty to all the charges and expressed his remorse and embarrassment to the officer involved in the incident and apologized to said officer. The D.H.B. members are not a party to this action.

8.     In a decision issued on 25 April 2003 (Exhibit "A"), the D.H.B. sanctioned petitioner to a total of ninety (90) days in disciplinary confinement, in East Wing of Post #6 S.H.U., with all privileges suspended for the duration of that confinement. Plaintiff was not allowed to use the phone except for emergencies and was only allowed one hour per week of non-contact visitation with

Palomo v. Ishizaki, et. al.                    Page 2 of 17                    Civil Rights Complaint

Case 1:04-cv-00013     Document 1     Filed 03/17/2004     Page 2 of 66

1 friends and family members. Other privileges suspended were use of the canteen, participation in
2 educational and rehabilitation programs, and the amount of property allowed in his possession. The
3 plaintiff was only allowed one hour out of cell time per day, while in restraints worn about the ankles
4 (leg-irons).

5 9.    The D.H.B. also recommended that upon release from disciplinary segregation, that the
6 Adjustment and Classification Committee (A.C.C.) conduct a review for reclassification of plaintiff
7 to a lower step level, pursuant to §IV(I) of General Order 99-003 "Disciplinary Procedures" (G.O.
8 99-003.  See Appendix.).  On 26 April plaintiff began serving his disciplinary segregation
9 confinement.

10 10.    On 3 July 2003 the D.H.B. held a second review hearing to consider reducing plaintiff's
11 sanctions. Their decision in their "Report (Review, 2nd)" (Exhibit "B"), was to reduce plaintiff's
12 sanction by releasing him on 6 July 2003 and placing him in administrative segregation pending a
13 hearing of the A.C.C.

14 11.    The D.H.B. indicated in it's "Report (Review, 2nd)" (see Exhibit "B"), that the decision to lift
15 the disciplinary sanctions of the plaintiff was based on his positive behavior and compliance with rules
16 and policies.

17 12.    On 6 July 2003, plaintiff completed seventy (70) days of his disciplinary confinement and was
18 placed in West Wing of Post #6 S.H.U., in administrative segregation status, pending a hearing of the
19 A.C.C. for possible reclassification. The placement of plaintiff in administrative segregation was in
20 accordance with General Order 97-006 "Adjustment Classification Committee Policy and
21 Procedures" §23.3 (G.O. 97-006. See Appendix).

22 13.    A hearing of the A.C.C. for case number 03-07-493, was held on 16 July 2003 with the
23 plaintiff present. The purpose of the hearing was to consider reclassification of the plaintiff based on
24 the D.H.B.'s recommendation.

25 14.    The institutional psychologist Dr. George Kallingal, Ph.D., A.B.P.S., submitted to the A.C.C.
26 a recommendation that the plaintiff not be reclassified to Maximum Custody, so that he may attend

27

28 Palomo v. Ishizaki, et. al.                    Page 3 of 17                    Civil Rights Complaint

forensic classes such as "Anger Management." (Forensic classes are rehabilitative programs provided by the Department's Forensic Division.) Maximum Custody inmates are not afforded any forensic programs contrary to departmental policy and Executive Order 97-05 "Relative to Rescinding Chapter 4 'Classification of Inmates' of Executive Order 94-19 and Promulgating a New Chapter 4 to Meet Present Departmental Goals toward Rehabilitation and Reintegration." (See Appendix.)

15.     The A.C.C. issued a "Notice of Hearing & Recommendation" (Exhibit "C") in which their recommendation was to "Reclassify Maximum Level 3 [sic]," with a review in three weeks from the date of acknowledgment of defendant, Acting Prison Security Administrator, Captain Jesse Tupaz. The demotion for plaintiff was three custody levels down from Medium Level 3 to Maximum Level 3. Defendant Tupaz acknowledged the A.C.C. recommendation on 28 July 2003. Plaintiff was then moved from Post #6 S.H.U. administrative segregation status, to Post #7 Maximum Housing Unit. The decision of the A.C.C. to demote was base on the "severity of Code violations."

16.     To the best of plaintiff's information and belief, the decision to demote plaintiff to Maximum Custody Level 3 from Medium Level 3, which was approved by defendant Tupaz, was based on the severity of the violation, that is, the "one hundred series" or "Greatest Misconduct Category" violation, Code 113 in E.O. 94-19 §3.5. (See Appendix.)

17.     Plaintiff's confinement in Post #7 Maximum Housing Unit is essentially the same as disciplinary confinement, except that he is allowed to have contact visitation for one hour a week (in restraints), make purchases from the D.O.C. canteen, and make phone calls. He is only allowed out of his cell for one hour a day, in restraints, to exercise, shower and use the phone. Inmates in Maximum housing, including plaintiff, are not allowed to participate in rehabilitative programs and activities which are provided in E.O. 97-05 and General Order 97-012 "Inmate Institutional Activities" (G.O. 97-012.), such as forensic and education classes, as well as recreation. (See Appendix.)

Case 1:04-cv-00013     Document 1     Filed 03/17/2004     Page 4 of 66

18. As per E.O.97-05 §4.11(A) (see Appendix), a hearing of the A.C.C., in case number 03-08-542, for plaintiff's three week review of reclassification, was held on 20 August 2003, with the plaintiff present.

19. The recommendation of the A.C.C., in their "Notice of Hearing & Recommendation" (Exhibit "D"), was to promote plaintiff to Medium Level 1 Security/Custody Classification, which would amount to a confinement with a lot less restrictions as compared to Maximum Custody Level 3. Their decision was based on the criteria set forth in E.O. 97-05 §4.10(B) (see Appendix), as it pertained to the plaintiff.

20. In the "Notice of Hearing & Recommendations", the A.C.C. stated in the section "ACC Justification" that it "[was] of the opinion the time served [in disciplinary segregation] was sufficient for the *punishment* for the violation." (Italics added. See Exhibit "D.")

21. Any classification which imposes a substantial adverse change in the conditions of confinement because of specific prior conduct is in fact disciplinary and therefore subject to the minimum standards of due process notwithstanding the presence of elements of treatment, security, or administrative necessity.

22. In the "Notice of Hearing & Recommendation," defendant Tupaz disapproved the recommendation of the A.C.C. and indicated that plaintiff will remain in Maximum Custody Level 3 in Post #7. His reason, which he indicated on the Notice, was based on the "[s]everity of the offense ..." in reference to plaintiff's recent disciplinary offense. (See Exhibit "D.")

23. The decision of defendant Tupaz was in effect to further punish plaintiff for his disciplinary violations. This is after plaintiff was punished, pursuant to the D.H.B.'s decision of 25 April 2003 (see Exhibit "A"), as modified by the D.H.B.'s decision of 4 July 2003 (see Exhibit "B"). In all, two separate administrative panels, the D.H.B. and the A.C.C., indicated in articulate and rational decisions, based on applicable regulations, that plaintiff's punishment had reached its conclusion and there was no longer any reason to further punish the plaintiff. Also the recommendation of the

Palomo v. Ishizaki, et. al.       Page 5 of 17       Civil Rights Complaint

Case 1:04-cv-00013   Document 1   Filed 03/17/2004   Page 5 of 66

institutional psychologist to place plaintiff in the general inmate population was ignored by defendant Tupaz as well.

24.     On or about 12 November 2003, Dr. Kallingal submitted a memo (Exhibit "E") to defendant Tupaz requesting to move plaintiff out of Maximum Custody pursuant to E.O. 97-05 §4.5(B)3(c). This request was also ignored by defendant Tupaz.

25.     On or about 10 December 2003, Dr. Kallingal submitted a second memo (Exhibit "F") to defendant Tupaz again requesting to remove plaintiff from Maximum Custody. This request was likewise ignored by defendant Tupaz.

26.     Plaintiff's placement in Maximum Custody implicates long term changes in his security classification. At the minimum, plaintiff would be housed in Maximum Housing Unit in Maximum Custody Level 3 for a period of eleven (11) months. Based on the long term change, plaintiff should have been afforded various due process protections which were not provided in defendant Tupaz's decision.

27.     The decision of defendant Tupaz to disapprove the A.C.C.'s recommendation, was made without the application of the minimal due process safeguards, which plaintiff was entitled to. The decision by defendant Tupaz rendered A.C.C.'s procedures into an idle gesture which is devoid of actual due process. Procedural due process is not intended for mere appearances, serving no real purpose.

28.     The decision of defendant Tupaz, to disapprove plaintiff's promotion recommended by the A.C.C., amounts to punishment in violation of Executive Order 97-05 §4.3 (see Appendix). Plaintiff was already punished for his disciplinary violations, through the sanctions imposed by the D.H.B., placement in administrative segregation, and the demotion to Maximum Custody Level 3 by the A.C.C. in A.C.C. case number 03-07-493 (see Exhibit "C"). Due process requires that a state prison institutional classification committee act without punitive intent within the framework of the prison administrative organization.

Palomo v. Ishizaki, et. al.                    Page 6 of 17                    Civil Rights Complaint

Case 1:04-cv-00013     Document 1     Filed 03/17/2004     Page 6 of 66

1   29.    The practice of the Prison Security Administrator, in this case defendant Tupaz, approving
2   or disapproving A.C.C. recommendations, is a violation of due process, in that a hearing is held by
3   a committee and the purpose of the committee is defeated by another, single individual, that is the
4   P.S.A. The P.S.A. makes a decision, with no due process safeguards in making that decision, which
5   makes the decision arbitrary, capricious, and irrational. Moreover, the actual decision made in this
6   case, to act contrary to the A.C.C. recommendation is particularly egregious.

7   30.    The decision of defendant Tupaz, disapproving the decision of the A.C.C., renders their
8   hearing, intending to provide procedural due process, meaningless.

9   31.    E.O. 97-05 §4.10(E) states that "[t]he ACC's recommendations shall be forwarded to the
10  Prison Security Administrator *for action*." (Italics added. See Appendix.) It is not made clear
11  anywhere in E.O. 97-05 what the "action" should be. However, since E.O. 97-05 does not contain
12  language which would allow "reconsideration," the term "action" should be interpreted to mean
13  "administrative implementation." Otherwise, such "action," taken without supporting rationale,
14  renders the due process accorded plaintiff in reaching the A.C.C. recommendation nothing more than
15  window dressing, creating the appearance of due process without any substance or value.

16  32.    Based on the language of E.O. 97-05 §4.10(A) which states that the A.C.C. "shall convene
17  to address, review and **decide** on the custody and program needs of the inmates" (emphasis added),
18  it is plaintiff's understanding that the "action" referred to in E.O. 97-05 §4.10(E) is ministerial. (See
19  Appendix.) The A.C.C. is an institutional classification committee which does not have the authority
20  to effectuate unit transfers of inmates. Accordingly, the regulation (E.O. 97-05 §4.10(E)) specifies
21  who is to execute the recommendation. As such, it does not vest discretionary authority in such
22  administrator to ignore or vary the recommendation. Plaintiff's understanding comports with the
23  traditional notion of due process.

24  33.    In light of the punitive result of defendant Tupaz's action, overriding the decision of the
25  A.C.C., plaintiff was subjected to a wrongful denial of fair administrative process which deliberately
26  deprived him of the benefits of procedural due process previously accorded him. Plaintiff was entitled

27

28  Palomo v. Ishizaki, et. al.                    Page 7 of 17                    Civil Rights Complaint

1  to a state created interest in E.O. 97-05 §4.10 (A), (B), (C), and (E) providing him the only
2  protection from whimsical and capricious acts.

3  34.     In effect, plaintiff was subjected to punishment on four separate occasions.   He was
4  sanctioned to disciplinary confinement by the D.H.B.; placed in administrative segregation, which was
5  punitive in nature, pending an A.C.C. hearing; demoted from Medium Custody Level 3 to Maximum
6  Custody Level 3 by the A.C.C., based on the referral by the D.H.B., this demotion was approved by
7  defendant Tupaz; and was prevented from promotion by defendant Tupaz contrary to the A.C.C.'s
8  recommendation to promote, in plaintiff's three week review hearing.

9  35.     The decision of defendant Tupaz, for plaintiff to remain in Maximum Custody Level 3, is
10  arbitrary and capricious, as well as vindictive towards the plaintiff.

11  36.     On 16 September 2003, the plaintiff filed an administrative appeal (Exhibit "G") of the
12  A.C.C.'s "Notice of Hearing & Recommendation" to the Director of Corrections, defendant Ishizaki,
13  appealing the disapproval by defendant Tupaz of plaintiff's promotion to Medium Level 1.   The
14  administrative appeal constitutes exhaustion of remedies in compliance with G.O. 97-006 §27 (see
15  Appendix) and Title 42 §1997(e).

16  37.     Defendant Ishizaki who is personally responsible for responding to inmates' administrative
17  appeals, did not respond to plaintiff's administrative appeal within the fifteen (15) calendar days
18  required by General Order 97-006 §27.4 (see Appendix),  and has not responded to the appeal.[1]

19  38.     The plaintiff filed a "Request for Administrative Remedy" (Exhibit "H") with defendant
20  Ishizaki on 10 October 2003, requesting to meet with him concerning his appeal of his custody
21  classification decision.

22
23
24
        [1] §27.4 of G.O. 97-006 provides "Appeals **must** be answered within fifteen ... business
25  days of receipt. Should the Director not answer an appeal after the inmate's appeal has been filed,
    the appeal becomes moot." (Emphasis added. See Appendix.) Notwithstanding the patently
26  irrational language (appeals must be answered but if not answered they become moot) it is
27  obvious that plaintiff had exhausted administrative remedy.

28

39.     Defendant Ishizaki responded to the request on 15 October 2003 and wrote in the "Response" portion of the remedy request for the plaintiff to "submit an agenda of issues/topics" that plaintiff wished to discuss with the defendant. Defendant Ishizaki also wrote that upon receiving the agenda he would schedule a meeting with the plaintiff. (See Exhibit "H.")

40.     Plaintiff filed a "Grievance Complaint" (Exhibit "I") on 14 October 2003, to defendant Ishizaki regarding his failure to respond to plaintiff's administrative appeal in accordance with E.O. 94-19 §3.32(b).

41.     Defendant Ishizaki responded on the reverse side of the grievance (see Exhibit "J") on 16 October 2003. He stated that plaintiff's "request concerning this matter is denied." The defendant again informed the plaintiff to submit any issues he wished to discuss and that defendant Ishizaki would then determine when he would meet with the plaintiff.

42.     On 21 October 2003, the plaintiff submitted another "Request for Administrative Remedy" (Exhibit "K") to defendant Ishizaki, with the list of issues defendant requested in his response of 16 October (see Exhibit "J"), regarding plaintiff's administrative appeal of the custody classification decision. Plaintiff cited violations of his due process and equal protection rights. Defendant Ishizaki did not respond to the "Request" nor did he schedule a meeting or meet with the plaintiff.

43.     Plaintiff received a memorandum from defendant Ishizaki dated 13 November 2003 (Exhibit "L"), which was a response to the remedy request (see Exhibit "K") with the issues requested by defendant. Defendant Ishizaki explained and cited sections of Executive Orders 94-19 and 97-05 in support of defendant Tupaz's decision for plaintiff to remain in Maximum Custody Level 3. The text of this document basically states that plaintiff is being further punished for his disciplinary violations through the classification process and did not really address the issues that were raised by the plaintiff in his "Request for Administrative Remedy" (see Exhibit "K").

44.     Plaintiff cited in his appeal, remedy requests, and grievances addressed to defendant Ishizaki, the punitive intent of defendant Tupaz's decision, defendant Ishizaki however failed to address the issue.

Palomo v. Ishizaki, et. al.                    Page 9 of 17                    Civil Rights Complaint

Case 1:04-cv-00013    Document 1    Filed 03/17/2004    Page 9 of 66

45.     Plaintiff has done all that is required of him and more in order to try and resolve his issues administratively and internally. Due to defendant Ishizaki's cavalier approach, plaintiff's efforts were to no avail.

46.     Another inmate, Daniel Turner, similarly situated to plaintiff, was also found guilty of violations of E.O. 94-19, including a "one hundred series," i.e., "Greatest Misconduct Category" violation in a separate and unrelated incident. This inmate pled not guilty to the charges against him, was found guilty, and sanctioned to disciplinary segregation as well as referral to the A.C.C. for possible reclassification to a lower custody level.

47.     Plaintiff and inmate Turner have almost identical criminal convictions, with inmate Turner having additionally, another aggravated murder conviction in local court and a drug conviction in federal court. Both plaintiff and inmate Turner have served approximately the same amount of time at the Department of Corrections. Plaintiff has not had any disciplinary problems for about four years before his placement in pre-hearing detention on 21 April 2003. Inmate Turner had two disciplinary actions against him within the past three years prior to his recent disciplinary action.

48.     Inmate Turner, similarly situated to plaintiff, had a hearing of the A.C.C. and in a decision of the A.C.C. (Exhibit "M") was recommended for demotion only to Medium Custody Level 1 from Medium Custody Level 3. This demotion was approved by defendant Tupaz even though inmate Turner had a "one hundred series" or "Greatest Misconduct Category" violation as well as a recent history of disciplinary violations.

49.     Medium Custody Classification Level 1 is one step above Maximum Custody Level 3, but in reality has a much greater degree of movement, more participation in programs and work assignments, as well as more privileges such as more visitation time. It lacks the punitive nature of Maximum Custody Level 3.

50.     Plaintiff received treatment from the defendants which was substantially and invidiously dissimilar to that received by other inmates confined in the Department of Corrections.

Palomo v. Ishizaki, et. al.                    Page 10 of 17                    Civil Rights Complaint

Case 1:04-cv-00013    Document 1    Filed 03/17/2004    Page 10 of 66

51. Plaintiff is not a suspect class. Plaintiff states a class of one equal protection claim since he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.

52. The acting Prison Security Administrator, defendant Tupaz, did not have a rational basis for treating the plaintiff differently from other similarly situated inmates, such as inmate Turner.

53. Defendant Tupaz, in the differential treatment to plaintiff, also violated E.O. 94-19 §3.2(A) which states that an inmate has "THE RIGHT to expect that as a human being [he will] be treated ... impartially, and fairly by all personnel." (See Appendix.)

54. On 15 October 2003, the plaintiff filed a Grievance Complaint (Exhibit "N") addressed to defendant Tupaz as an exhaustion of remedies, concerning the lack of Forensic Classes for Maximum Custody Level inmates. These classes are provided to the rest of the general inmate population as per G.O. 97-012 "Inmate Institutional Activities." (See Appendix.)

55. In the grievance, plaintiff cited unfair treatment and discrimination towards Maximum Custody Level inmates. Plaintiff indicated that he requested twice to enroll in forensic classes without any response. (See Exhibit "N.")

56. Defendant Tupaz failed to respond to plaintiff's grievance (see Exhibit "N"), so plaintiff filed another grievance (Exhibit "O") to defendant Ishizaki. This second grievance concerned defendant Tupaz's failure to respond to the grievance concerning forensic classes.

57. On 4 November 2003, defendant Ishizaki responded to plaintiff's second grievance stating that the "Casework manager [and] Capt[ain] Tupaz will design a program for max level 3 inmates." By it's expression, the response constitutes an admission of plaintiff's entitlement to such programs. (See Exhibit "O.") This program never materialized.

58. The department's Clinical Psychologist Dr. Kallingal sent two memos to defendant Tupaz (see Exhibits "E" and "F"), recommending plaintiff's promotion from Maximum Custody Level 3 so that plaintiff may attend forensic programs. In these memos Dr. Kallingal stressed plaintiff's ability to be able to participate in rehabilitation programs.

1    59.    Plaintiff has a liberty interest in forensic programming as per E.O. 97-05 and G.O. 97-012.

2    Plaintiff is being denied forensic programming by the defendants without due process of law.

3    60.    Plaintiff is being denied participation in forensic programs which are being afforded to other

4    inmates of the Department of Corrections. This is a denial of plaintiff's equal protection of the laws..

5    61.    Plaintiff was segregated from the general inmate population by arbitrary and capricious means,

6    having been literally deprived of procedural due process. Plaintiff has a liberty interest in remaining

7    in the general inmate population. The conditions of confinement which plaintiff is being subjected to

8    in Post #7 Maximum Housing Unit, impose atypical and significant hardship on plaintiff as compared

9    to ordinary incidents of prison life, in the general inmate population in the Guam Department of

10    Corrections. E.O. 97-05 and G.O. 97-006 create a protected liberty interest for plaintiff to remain

11    free from the type of confinement imposed by placement in Maximum Custody Level 3.

12    62.    The furtherance of punishment by the defendants against plaintiff, beyond the sanctions

13    imposed by the D.H.B., has caused and is causing the plaintiff physical pain and discomfort, emotional

14    distress, mental anguish, and humiliation. The physical pain and discomfort was caused by restraints

15    (leg-irons) on plaintiff's legs anytime he was moved out of his cell. Such caused lacerations, scarring,

16    and infuses rust from the restraints into plaintiff's body.

17    63.    All law and policy cited in this complaint were clearly established at the time of the facts

18    related herein.

19    CLAIMS

20    FIRST CAUSE OF ACTION

21    64.    The actions of defendant Tupaz as described in paragraphs 22 through 35, deprived plaintiff

22    of due process of law in violation of the Fourteenth Amendment.

23    65.    Plaintiff's Fourteenth Amendment right to due process in D.O.C. administrative proceedings

24    was violated when defendant Tupaz made a decision regarding plaintiff's custody classification

25    without minimal due process safeguards.

26

27

28    Palomo v. Ishizaki, et. al.          Page 12 of 17          Civil Rights Complaint

66.     The decision of the A.C.C. which provided plaintiff with minimal due process safeguards as required by law were rendered meaningless by the action of defendant Tupaz.

## SECOND CAUSE OF ACTION

67.     The actions of the defendant Tupaz in paragraphs 22 and 35, denied plaintiff's due process of law in violation of the Fourteenth Amendment.

68.     Plaintiff's Fourteenth Amendment right to due process in D.O.C. administrative proceedings was violated when defendant Tupaz made a decision regarding plaintiff's custody classification with the intent to further punish the plaintiff.

## THIRD CAUSE OF ACTION

69.     The action of defendant Tupaz stated in paragraph 28 violated E.O. 97-05 §4.3.

70.     Plaintiff was subjected to further punishment through the classification process by the decision of defendant Tupaz contrary to E.O. 97-05 §4.3.

## FOURTH CAUSE OF ACTION

71.     The actions of defendant Ishizaki as delineated in paragraph 37 denied plaintiff's due process of law in violation of the Fourteenth Amendment.

72.     Plaintiff's Fourteenth Amendment right to due process in D.O.C. administrative proceedings was violated when defendant Ishizaki did not respond to plaintiff's administrative appeal.

## FIFTH CAUSE OF ACTION

73.     The inaction of defendant Ishizaki stated in paragraph 37 violated General Order 97-006 §27.4.

74.     Plaintiff was entitled to a response from defendant Ishizaki on his administrative appeal in accordance with G.O. 97-006, and none was given.

## SIXTH CAUSE OF ACTION

75.     The actions and inactions of defendant Ishizaki as described in paragraphs 36 through 45 denied plaintiff's due process of law in violation of the Fourteenth Amendment.

Palomo v. Ishizaki, et. al.                    Page 13 of 17                    Civil Rights Complaint

1  76.  Plaintiff's Fourteenth Amendment right to due process was violated when defendant Ishizaki

2  failed to correct the violations of plaintiff's due process committed by defendant Tupaz.

3                          SEVENTH CAUSE OF ACTION

4  77.  The actions and inactions of defendant Ishizaki as delineated in paragraphs 43 and 44 denied

5  plaintiff's due process of law in violation of the Fourteenth Amendment.

6  78.  Plaintiff's Fourteenth Amendment right to due process was violated when defendant Ishizaki

7  allowed plaintiff to be further punished through the Department of Correction's classification system.

8                          EIGHTH CAUSE OF ACTION

9  79.  The action of defendant Ishizaki as described in paragraphs 37 through 45 violated

10  E.O. 97-05 §4.3.

11  80.  Plaintiff was subjected to further punishment through the classification process contrary to

12  E.O. 97-05 §4.3 and this was not corrected by defendant Ishizaki.

13                          NINTH CAUSE OF ACTION

14  81.  The actions of the defendant Tupaz as described in paragraphs 22 and 46 through 53, denied

15  plaintiff's right to equal protection of the laws.

16  82.  Plaintiff's Fourteenth Amendment right to equal protection of the law was violated when

17  defendant Tupaz invidiously discriminated against plaintiff in favor of another person or class of

18  persons, with no rational basis for the differentiation in treatment.

19                          TENTH CAUSE OF ACTION

20  83.  The action of defendant Tupaz as stated in paragraph 53 violated E.O. 94-19 §3.2(A).

21  84.  Plaintiff's right to fair and impartial treatment which is clearly stated in E.O. 94-19 §3.2(A),

22  was violated by defendant Tupaz in his decision for plaintiff to remain in Maximum Custody Level 3.

23                          ELEVENTH CAUSE OF ACTION

24  85.  The actions of the defendants Tupaz and Ishizaki in paragraphs 54 through 59, denied

25  plaintiff's right to forensic programs without due process of law.

26

27

28  Palomo v. Ishizaki, et. al.              Page 14 of 17              Civil Rights Complaint

86.     Plaintiff had a liberty interest to participation in forensic programs while in Maximum Custody and was arbitrarily denied that participation by defendants without due process of law.

RELIEF

WHEREFORE, plaintiff requests this Honorable Court grant the following relief:

A.      Issue a declaratory judgment that defendants violated the United States Constitution and state law when:

    1)      Defendant Tupaz disapproved the decision of the A.C.C. without providing the plaintiff with the minimal due process safeguards he is entitled to;

    2)      Defendant Tupaz further punished plaintiff without due process of law by disapproving his custody classification promotion when classification is not to be used as punishment;

    3)      Defendant Tupaz denied plaintiff's due process when he made a decision he was not authorized to make;

    4)      Defendant Tupaz invidiously discriminated against plaintiff by disapproving plaintiff's promotion without a rational basis;

    5)      Defendant Ishizaki failed to respond to plaintiff's administrative appeal of the custody classification decision of defendant Tupaz:

    6)      Defendant Ishizaki violated plaintiff's due process by not taking corrective action regarding the violations of plaintiff's due process by defendant Tupaz;

    7)      Defendants Tupaz and Ishizaki deprived plaintiff of forensic classes that he is entitled to without due process;

B.      Issue an injunction ordering that defendants or their successors:

    1)      Return the plaintiff to his custody status in Medium Custody Level 3, in the general inmate population, with all rights, privileges, and programs, which plaintiff was afforded prior to his placement in pre-hearing detention on 21 April 2003, restored to plaintiff;

2)    Place plaintiff in rehabilitative programs as provided by Executive Orders and departmental policies;

3)    Reinstate the plaintiff in his work assignment in the V.R.S. Welding Shop;

4)    Expunge all record of the incident from plaintiff's record, files, and/or jacket, with no references to said incident to be used in any future hearings concerning the plaintiff;

5)    Cease the practice of the Prison Security Administrator approving or disapproving the decisions of the A.C.C.;

6)    Comply with applicable federal and local law, caselaw, and rules and regulations of D.O.C.

C.    Grant compensatory damages in the following amounts:

1)    $30,000, or in such amount as will be proved at trial, against defendant Ishizaki in his individual capacity;

2)    $30,000, or in such amount as will be proved at trial, against defendant Tupaz in his individual capacity;

D.    Grant punitive damages of $10,000 against each of the defendants in their individual capacities.

E.    Grant such other relief in law or equity as it may appear plaintiff is entitled.


Respectfully submitted,

_Vincent Palomo_
Vincent Palomo

Palomo v. Ishizaki, et. al.                Page 16 of 17                Civil Rights Complaint

Case 1:04-cv-00013    Document 1    Filed 03/17/2004    Page 16 of 66

<u>VERIFICATION</u>

I, Vincent Palomo, am the plaintiff in the above entitled action. I have read the foregoing complaint. The facts stated therein are within my knowledge and are true and correct, except those matters stated on information and belief, and, as to those, I believe them to be true and correct.

All attached Exhibits "A" through "O" are true and correct copies of their originals.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated on this _12th_ day of _March_ 2004.


_Vincent Palomo_
Vincent Palomo
Department of Corrections
P.O. Box 3236
Hagåtña, Guam 96932

Palomo v. Ishizaki, et. al.            Page 17 of 17            Civil Rights Complaint

# EXHIBITS

MEMBERS PRESENT (EXHIBIT-B)
[X] M. M. Quitugua, Chairperson
[] G. G. Calvo, 1st Vice Chairman
[] D.C. Cruz, Vice-Chairperson
[] A.S. San Nicolas, Member
[X] A.P. Borja, Member
[X] J. U. Pangelinan, Member
[X] R.R. Concepcion, Member

# REPORT

**Exhibit "A"**

| INMATE (Last, First, Middle): | TYPE OF HEARING: | CASE NO: |
|---|---|---|
| PALOMO, Vincent | [X] Preliminary<br>[]Continuance<br>[X] Final | DHB2003-04-055 |

| DATE OF INCIDENT: | DHB HEARING DATE: | PRESENTING PERSONNEL: |
|---|---|---|
| 21 April 2003 | 25 April 2003 | Jason Paulino<br>Correction Officer I |

| OFFENSE CODE: | SUMMARY OF CHARGE(S) as noted by the DHB Chairman: |
|---|---|
| 113 - Threatening another with serious bodily harm.<br><br>212 - Insolence towards a staff member.<br><br>329 - Using abusive or obscene language toward staff member. | At about 1640hrs, while officer Paulino was escorting Post 16 inmates back from dinner, he saw and heard Inmate Palomo yelling from the basketball court, in chamorro toward him and Post 16 inmates "Na Lahi-Hao boy! Bai Yamak I Pachot-Mu!." This was witnessed by Cpl F. B. Sayas.<br><br>Officer Paulino didn't know whom Inmate Palomo was directing his statement to. So the officer secured Post 16 inmates into their unit and contacted Lt. G. G. Calvo and informed him of what happened.<br><br>At about 1655hrs, Officer Paulino approached the main entrance to Post 16 where inmate Palomo was with CO A. Q. Sanchez. Officer Paulino then inquired with inmate Palomo who he was yelling at. The inmate responded "I'm talking to you" in a very aggressive tone of voice. (The officer reflected that Palomo was upset about a previous verbal counseling he conducted with the inmate.)<br><br>Inmate Palomo then threatened the officer by stating "Yangin man hao, pula i badge-mu ya bai patik hao!". At this time Officer Sanchez stepped in between the officer and inmate. Inmate Palomo then went back to his Unit, Post 18.<br><br>At 1726hrs, Post 18 was placed on Lock-Down by Lt Calvo and at 1726hrs Inmate Palomo was placed on Pre-Hearing Detention. |

**NOTICE OF CHARGE(S):**

A. Advanced written notice, which shall be not less than twenty-four hours to the DHB hearing), of the charge(s) (copy of incident report) was given to inmate on: <u>23 April 2003</u> at <u>0735hrs</u> by <u>Cpl A. P. Borja</u>

B. The DHB was held on <u>25 April 2003</u> beginning at <u>1010hrs</u> and concluded at about <u>1055hrs</u> on <u>25 April 2003</u>.

C. The Inmate was advised of his/her rights [hearing to be heard by an impartial board, right to be present in the hearing except during deliberations, hearing is administrative, Report of Findings by DHB within 24 hours after case is concluded] before the DHB by <u>Cpl A.P. Borja</u> on <u>25 April 2003</u> and a copy of the advisement form is on file.

**STAFF REPRESENTATIVE [COUNSEL SUBSTITUTE]:**

A. [X] The inmate waived his right to Staff Representation (DOC employee).

B. [] The inmate requested Staff Representation and_____ came before the hearing.
Personnel

C. [] The requested Staff Representative declined or could not appear but inmate was informed of option to postpone the hearing to obtain another staff representative with the result that_____

**PRESENTATION OF EVIDENCE:**

A. [X] The inmate has been advised of his/her right to present statements or to remain silent to present document, including written statements of unavailable witnesses, and for relevant witnesses to appear in his behalf at this hearing.

B. [X] The inmate ADMITS the charge(s). Cite Codes <u>113, 212 and 329 (apb)</u>

C. [] The inmate DENIES the charge(s). Cite Codes_____

D. Summary/Highlights of the hearing: <u>During the Preliminary the Plaintiff (ofcr Paulino)was asked if had any additions/deletions to his Incident Report in which he requested to delete (Code 406, not applicable) to change the time on line 21 to (1733hrs) and to add on his signature block the date (21 April '03/2130hrs); The Defendant(inm. Palomo)was made to understand the changes. The defendant was in turned asked if had any technicalities/Due Process violations to address, and quoted E.O. 94-19, Chap 3, sec. 3.16 "Investigation shall be initiated by the supervisor of the employee who reported the incident" questioning the role of Sgt Borja whom conducted the investigation, when it should've been Lt Calvo who is the supervisor of the Plaintiff. DHB-Sgt Borja is at a supervisory level and his role is justifiable. If it read along the line "Immediate" then the issue would be considered. Another issue was sec. 3.12-quoting the sentence which reads "Each episode should be written on a separate incident report" then pointing out in the I.R. that on line #1 that about 1630hrs and incident occurred, on the same report at 1655hrs another incident occurred. His question is shouldn't that be two separate episodes? DHB-defined "Episode-an event or series of events complete in itself but forming part of a larger one". Therefore the chain of events that took</u>

Document Scanned Copy Page 19 of 66

place at 1640hrs was related to the events that took place at 1655hrs. The Defendant understood the explanations. With no other issues presented, the Incident Report and its supplements were read and defendant made to understand the charges presented, was asked his plea to the following codes . . . **113**- defendant entered a voluntary plea of "Guilty" ; **212**-defendant entered a voluntary plea of "Guilty" and for **329**- defendant entered a voluntary plea of "Guilty". Inmate Palomo was informed that by pleading "Guilty" he's waived his right to appeal his case to the Director of Corrections, inmate understood. **Summary of Closing Statements: Defendant**- expressed his remorse and embarrassment for his actions toward Officer Paulino, reflecting that this incident derived from a previous encounter with officer Paulino and should've been in more control of himself and handle the matter in a civil manner. Realizes that the two things he cherishes the most, his wife and his membership in the Inmate Advisory Council is at stake. Humbly request for Leniency and hopes the Board take into consideration that this is the first time he's been before the DHB in five years, and the support and dedication he's given the department while at his work assignment. Extended a handshake to the Plaintiff and apologized. **Plaintiff**- Reflected on the past incident, and justified his actions. With nothing else, the Plaintiff/Defendant were excused at 1055hrs. Deliberation took place at the Operations Office at 1110hrs on the same date of hearing and concluded at 1135hrs on the same date. (apb)

E. Witnesses requested by inmate/Presenting Personnel:

1. [X] The inmate requested no witnesses.

2. [X] The Presenting Personnel requested no witnesses.

3. [] The following persons were called as witnesses at this hearing and appeared as requested by inmate:___
_____

4. [] The following persons were called as witnesses at this hearing and appeared as requested by the presenting personnel:_____

5. [] A summary of testimony of each witness is noted:_____

6. [] The following persons requested were not called for the reasons given:_____

7. [] Unavailable witnesses were requested to submit written statements and those statements received were considered. The witnesses and a summary of those statements were noted.

8. [X] In addition to the Incident Report and Investigation, the DHB considered the following documents:___
**(A)** -Informational report from CO II F. B. Sayas dated 21 April 2003-That on 21 April '03, while monitoring recreation for Post 18 inmates. He noted post 16 inmates returning to their unit from dinner, escorted by CO J. Paulino. Officer Sayas then heard Inmate Vincent Palomo, from the basketball court, yell in Chamorro "Bai vamak i pachot-mu!". The statement made appeared to be directed to Post 16 inmates, but to no one in particular. Inmate Palomo then continued to play basketball as if nothing has happen. Upon officer Sayas securing recreation, he noticed inmate Palomo at Post 16 front entrance, apparently authorized by Officer A.Q. Sanchez. CO Sayas then gestured to secure Palomo. CO Sayas then proceeded to Post 16 to inquire what was going on, and Ofcr. Paulino stated that the statement by Palomo was directed to him. Palomo accusing him of a incident that happened while at an IAC meeting. Because of this incident Post 18 was placed on Lock down and inmate Palomo handcuffed and escorted to Post 6 for PHD. **(B)**-Informational Report from CO A.Q. Sanchez dated 21 April 2003- That while conducting a pat-search on post 16 inmates from dinner, officer Paulino informed him that inmate Palomo was yelling toward Post 16. At about 1700hrs, ofcr. Sanchez authorized inmate Palomo to approach Post 16, to inquire what or who he was yelling at. At this point in time inmate was apparently upset at CO Paulino regarding a previous incident. Telling officer Paulino to take off his badge and fight in the Chamorro language "Ha, kao lahi hao, pula badge mu yan tan apaneti!" in an aggressive tone. Before leaving Post 16, inmate Palomo warned and told CO Paulino to watch his mouth in the Chamorro language "Adahi i pachotmu". (apb)

9. [] Confidential information were considered and not provided the inmate. The inmate was advised of the general content of the confidential information without jeopardizing the safety and security of the source.

FINDINGS OF THE DHB:
A. [] The case was continued.

B. [X] The act(s) was/were committed as charged. Cite Code(s) 113, 212 and 329 (apb)

C. [] The following act(s) was/were dismissed. Cite Code(s)_____

D. [] No prohibited act(s) was/were committed. Order expungement of record.

SPECIFIC EVIDENCE RELIED ON TO SUPPORT FINDINGS:
1. See "Presentation of Evidence" E #8 (A)(B).
2. Inmate Vincent Palomo's voluntary admission to "Guilt" to all charges.

SANCTIONS/ACTIONS TAKEN:
That upon receipt of this decision, Inmate Vincent Palomo shall be placed in Disciplinary Segregation for the following code violations . . . **Code 113 (60)days; Code 212 (20)days and for Code 329 (10)days** . . . All sanctions are to run consecutive, for a total D-Seg. period of **(90) days**.

While in D-Seg. all privileges are suspended, with the exception of calls to and from attorney of record, non-contact visitation and emergency calls (to be verified by platoon commander on duty).

It is also recommended that upon release from segregation, That the adjustment and classification committee conduct a review for reclassification to a lower step level, Pursuant to Section IV (I) of G.O. 99-003.

**REASON FOR SANCTIONS/ACTIONS TAKEN:**

The board acknowledges his request for leniency, but on the flip side, the actions of inmate Palomo are not to be tolerated.

The maximum sanction that may be imposed for a 100 series is 365days. The (60)days imposed is approx. .16% of 365. For a 200 series is 180days. The (20)days imposed is approx. .11% of 180. For a 300 series is (60)days. The (10)days imposed is approx. .16% of 60.

Sanctions to run consecutive . . .refer to EO 94-19, Chap. 3, Sec. 3.12 (C)(1).

**APPEAL RIGHTS**

[X] The inmate has been advised during the initial hearing of his/her right to appeal this action within 15 calendar days from receipt of the DHB REPORT to the Director of Corrections. Inmate is further advised that a plea of guilty to any or all code violation(s) is not appealable or whenever, a plea or sanctions is negotiated between inmate and DHB.

**CERTIFICATION OF DHB REPORT:**

DHB Chairman M.M. Quitugua, COS II          Date: 25 April 2003          Time: 1915hrs

**ACKNOWLEDGMENT OF DHB REPORT:**
A copy of this DHB Report has been given to the inmate.

Inmate's signature  Vincent Palomo          Date: 04-26-03          Time: 8:15 AM

Original :     DHB File
Copies:       Inmate; Presenting Personnel, Director, Warden, ACC, CCSD, DATS

## DISCIPLINARY HEARING BOARD
Department of Corrections
Mangilao, Guam

COPY

## REPORT (Review, 2nd)

Exhibit "B"

| MEMBERS PRESENT | |
|---|---|
| [X] | A.S. San Nicolas, Chairman |
| [X] | A.P. Borja, 1st Vice Chairman |
| [] | J.U. Pangelinan, 2nd Vice Chairman |
| [] | T. King, Member |
| [] | C.M. Cruz, Member |
| [] | L. Sanchez, Member |
| [X] | S. Donato, Alternate |
| [] | L. Cepeda, Alternate |

**INMATE (Last, First, Middle):**

Palomo, Vincent

**CASE NO:**

DHB2003-05-055

### NOTICE OF HEARING:

A. The DHB received the request to review inmate's case while in Disciplinary segregation on June 17, 2003.
B. Advance notice of hearing was given inmate on June 19, 2003 at 1400hrs by R.R. Barrows, CO I.
C. The DHB review was held on July 3, 2003 beginning at 1040hrs and concluded at 1051hrs on July 3, 2003.

### REVIEW OF THE INITIAL DHB CASE:

A. The incident occured on April 21, 2003 at about 1640hrs. The incident took place in ACF Post # 16.
B. The presenting personnel was CO I J.A Paulino.
C. Prior to the incident , the inmate was housed in Post #18 and His/Her current custody classification is Medium III.
D. Finding of the DHB:

| Code: 113, 212, 329 | Inmates Plea: Guilty to all charges | DHB Findings: Accepts Plea | Sanctions: 90 days disciplinary Segregation. |
|---|---|---|---|

### CASE PRESENTATION BY INMATE/OTHER(S):

A. Summary of Inmate's case presentation: See attached inmate written presentation.

B. Summary of Forensic workers presentation: See attached.

C. Summary of presenting personnel in the DHB hearing presentation : Inmate has not displayed any negative behavior, He has been in compliance to rules and policies.

D. Other presentations: None.

### FINDING OF THE DHB AT THE CASE REVIEW:

A. [] Affirm sanction(s) initially imposed, and set the next review for a later date upon request.

B. [X] Reduce sanction(s): Effective July 6, 2003 inmate shall be lifted from disciplinary segregation and placed on administrative segregation pending ACC review. Inmate privileges are restored.

C. [] Commute to time served and release the inmate from disciplinary segregation effective _____ At _____

### VOTING BY DHB MEMBERS:

A. 3 Yes 0 No 0 Abstention.

### CERTIFICATION OF DHB FINDING:

DHB Chairman   A.S. San Nicolas, CO III      Date: July 4, 2003      Time: 1000hrs

### ACKNOWLEDGMENT OF DHB REPORT:
A copy of this DHB Review of inmate while in Disciplinary segregation has been given to the inmate.

Inmate's signature: _____   Date: _____   Time: _____

| ADJUSTMENT CLASSIFICATION COMMITTEE<br>Department of Corrections<br>Mangilao, Guam<br><br>NOTICE OF HEARING & RECOMMENDATIONS | ACC MEMBERS (Present)<br>[X] B.A. Lotz, Chairperson<br>[X] J.T. Afaisen, 1st V/Chairperson<br>[X] L.M. Ortiz, Member<br>[X] R.A. Aromin, Member<br>[] M.T. Perez, Secretary/Member |
|---|---|

**Exhibit "C"**

| INMATE: (Last, First, Middle Initial)<br><br>Palomo, Vincent | CASE NO.:<br><br>03-07-493 |
|---|---|

| CURRENT CLASSIFICATION:<br><br>Medium Level 3 | HEARING DATE:<br><br>7/16/03 | HEARING TIME: |
|---|---|---|

PROGRAM ELIGIBILITY: None due to Crime

[] Work Credits_                                    [] Work Release_

[] Education Release_                          [] Other_

| TYPE/PURPOSE OF PRESENTATION:<br><br>DHB referral per DHB 2003-05-055 | PRESENTER:<br><br>SELF |
|---|---|

| OFFENSE:<br>CF 170-90  Aggravated Murder (6 counts)<br>              Burglary II<br>              Robbery I (2 counts)<br>              Possession and Use of a Deadly Weapon in the Commission of a Felony<br>              (3 counts) | AGGREGATE SENTENCE:<br><br>Life w/o parole plus 135 years |
|---|---|

| PAROLE ELIGIBILITY DATE:<br><br>N/A | FULL-TIME RELEASE DATE:<br><br>N/A | TIME SERVED (As of Hearing Date):<br><br>13 years 1 month 28 days |
|---|---|---|

CORRECTION SOCIAL WORKER'S RECOMMENDATION:

OTHER OFFICIAL(S) RECOMMENDATION:
[X] Unit OIC:  2 reports from Post 6, No problems noted
[X] Forensic Administrator: Has completed Human Sexuality, Conflict/Anger Management, and Family Domestic Violence
[ ] Work Assignment Supervisors:
[ ] Program Coordinators (Education/Chapel):
[ ] Computation:
[X] Other Official Recommendation: Lt Calvo spoke on achieving a balance to show inmate's achievements/accomplishments

ACC RECOMMENDATION:

Reclassify Maximum Level 3

Next Review Schedule: 3 weeks

ACC JUSTIFICATION:

Severity of Code violations (Codes 113, 212 and 329)

VOTING:   3   YES     0   / NO   /   ABSTENTION   Reason:_

SUBMITTED BY: _____                    DATE:   7-25-03
              B.A. LOTZ, ACC CHAIRPERSON

OFFICIAL ACTION:

[X] APPROVED
[ ] DISAPPROVED                    DATE   7-28-03

REASON:

Capt. J.Q. Tuñaz, acting
Prison Security Administrator

Appeal Procedures: Refer to DOC General Order No. 97-006 or ACC Policies & Procedures (03/29/96) Sect. 27.0-27.4.

Revised:        10/27/98
Original:        ACC File
Distribution:   Inmate, Caseworker, Unit File; Superintendent; Director; PSD; DATSD; Visitation; Education, Work Assignment

**Exhibit "D"**

| ADJUSTMENT CLASSIFICATION COMMITTEE<br>Department of Corrections<br>Mangilao, Guam<br><br>NOTICE OF HEARING & RECOMMENDATIONS | ACC MEMBERS (Present)<br>[X] B.A. Lotz, Chairperson<br>[] J.T. Afaisen, 1st V/Chairperson<br>[X] L.M. Ortiz, Member<br>[X] R.A. Aroman, Member<br>[X] M.T. Perez, Secretary/Member |
| --- | --- |

| INMATE: (Last, First, Middle Initial)<br>Palomo, Vincent P. | CASE NO.:<br>03-08-542 |
| --- | --- |

| CURRENT CLASSIFICATION:<br>Maximum Level 3 | HEARING DATE:<br>08-20-03 | HEARING TIME: |
| --- | --- | --- |

PROGRAM ELIGIBILITY: Not eligible due to crime

[] Work Credits_                                    [] Work Release_

[] Education Release_                              [] Other_

| TYPE/PURPOSE OF PRESENTATION:<br><br>3 week Institutional Review | PRESENTER:<br><br>CSW B. Lotz |
| --- | --- |

| OFFENSE:<br>CF 170-90  Aggravated Murder (6 counts)<br>Burglary II<br>Robbery I (2 counts)<br>Possession of a Deadly Weapon in the Commission of<br>a Felony (3 counts) | AGGREGATE SENTENCE:<br><br>Life w/o Parole plus 155 years. |
| --- | --- |

| PAROLE ELIGIBILITY DATE:<br><br>NE | FULL-TIME RELEASE DATE:<br><br>NE | TIME SERVED (As of Hearing Date):<br><br>13 years 5 months 10 days |
| --- | --- | --- |

CORRECTION SOCIAL WORKER'S RECOMMENDATION:
Inmate has used his time in maximum custody in a productive manner

OTHER OFFICIAL(S) RECOMMENDATION:
[X] Unit OIC: _2 reports submitted, no problems noted
[X] Forensic Administrator: has completed Human Sexuality, Conflict/Anger Management, Family Domestic Violence, Stress Management, Smoking Cessation
[ ] Work Assignment Supervisors:
[ ] Program Coordinators (Education/Chapel):
[ ] Computation:
[ ] Other Official Recommendation:

ACC RECOMMENDATION:

Upgrade to Medium Level 1 Security/Custody Classification

Next Review Schedule: 11 months

ACC JUSTIFICATION:
ACC saw the severity of the offense but balanced this with the time served in Disciplinary Segregation and is of the opinion the time served was sufficient for the punishment for the violation. ACC also considered the time already served in prison and the last DHB being in 1999. ACC also considered the positive accomplishments of his incarceration, his marriage, and his religious convictions. Inmate has used his time in maximum productively. He has tried to resolve past conflicts and live harmoniously with everyone.

| VOTING:  3  YES  /  0  NO  _  ABSTENTION  Reason:_ |
| --- |

SUBMITTED BY: _signature_                                      DATE: 08-27-03
Linda M. Ortiz, 2nd vice/ACC CHAIRPERSON

OFFICIAL ACTION:

_signature_                    [ ] APPROVED
                                       [X] DISAPPROVED          DATE: 9-2-03
Capt. J.Q. Tupaz, acting          REASON: Severity of offense noted although ACC cites
Prison Security Administrator    past accomplishments as a positive. Inmate went
                                       too security that all the violations provided for
                                       the security warned produce him from acting out
Appeal Procedures: Refer to DOC General Order No. 97-006 or ACC Policies & Procedures (03/29/98) Sect. 27.0-27.4.
                                       inappropriately. To upgrade at this time is not conducive
                                       to safety, security and good institution order.
Revised:       10/27/98          Shall remain at max level at. _signature_ 9-2-03
Original:      ACC File
Distribution:  Inmate; Caseworker; Unit File; Superintendent; Director; PSD; DATSD; Visitation; Education; Work Assignment_____

## Forensic Unit

Inmate:     **Vincent Palomo**

D.O.B.      03/27/58

Post:       Max Unit

Nov. 12, 2003

   This inmate requested to have a session to talk about a problem he is currently experiencing. He is concerned about his placement in the Max Unit. He had a DHB case and he pled guilty and he served time in confinement. After that he was demoted and placed in the Max Unit.

   He reported that he was doing much better as an inmate after his marriage. His marriage had a beneficial effect on his wife and also on him. He regrets what he did and which caused his demotion. He is now motivated to do what is needed to become a better person. He is very interested in taking part in the rehab programs. But his is also concerned that he cannot take part in programs if he is placed in the Max Unit. He is therefore asking that he be promoted to Medium Level I so he can take part in the available programs. This inmate generally does well in programs. It is better for him to attend programs than staying idle in the unit. The next cycle will start in January 2004 and at least two programs will be offered to inmates who have long sentences.

   I would strongly recommend that he be promoted so he can take part in at least two programs. He is likely to get worse if he idles his time in the unit. He has already paid a price for what he did. It is advantageous for all parties to grant him promotion and have him take part in at least two programs.

George Kallingal, Ph.D.
Clinical Psychologist



## Department Of Corrections
### Adult Correctional Facility
#### Mangilao, Guam

## Exhibit "F"

### FORENSIC UNIT

**Inmate:**   **Vincent Palomo**                    Dec. 11, 2003

**D.O.B.**   03/27/58

**Post:**   Max Unit/P-7

This inmate talked about his difficulties in his current placement. He said that he is concerned because he is building up much stress and he is afraid that he may act out. He was given feedback on this and informed that acting out will only lead to more negative consequences. He was encouraged to learn from the experiences and make himself a more mature person.

Other inmates in the Max Unit have reported that they are experiencing the negative effects of long-term confinement. If these inmates do not present major security problems, they can participate in programs. If adequate security measures can be taken, they can participate in programs and this may give them a sense of relief resulting from long-term confinement.

This inmate is able to handle this type of an arrangement and therefore I recommend that he be allowed to attend two programs in the next cycle.

*George Kallingal, Ph.D, ABPS*

Dr. George Kallingal, Ph.D., ABPS
Clinical Psychologist

12/30/03.   Please provide copies of
the notes on December 11 and November 12, 0_
to the Warden. I would recommend
that he be promoted to take
take advantage of the available programs
available within his ___ George Kallingal, Ph.D

INMATE NAME: Vincent Palomo        S/S NO.: 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    UNIT: Post#7  DATE: September 16, 200:

NOTICE TO INMATE:  You are advised that prior to filing a Request for Administrative
                   Remedy, you MUST attempt to informally resolve your complaint
                   through your correctional counselor.  Please follow the three (3)
                   steps listed below:

1.  STATE YOUR SPECIFIC COMPLAINT:  This appeal is in regards to the Official Action
    imposed upon my person in ACC case No. 03-08-542.  I believe that the actions
    takened are inappropriate and unconstitional.  I therefore submit my appeal for
    administrative review pursuant to General Order No. 97-006 ACC Policies & Procedures
    Section 27. APPEAL §§§27.0, 27.1(a),(b);(c) and  27.2

2.  STATE WHAT EFFORTS YOU HAVE MADE TO INFORMALLY RESOLVE YOUR COMPLAINT: _____
    Exhausting  Departmental established policies  and procedures. _____
    _____
    _____
    _____

3.  STATE WHAT RESOLUTION YOU EXPECT:   see  attached appeal _____
    _____
    _____
    _____

                    INMATE SIGNATURE: *Vincent Palomo*        DATE: September 16, 2003
CORRECTIONAL CASEWORKER'S COMMENTS (STEPS TO RESOLVE): _____
_____
_____
_____

                    CASEWORKER'S SIGNATURE: _____   DATE: _____
                    CCSD SUPERVISOR REVIEW: _____   DATE: _____

STAFF ACTION:

_____  NOT ACTED ON - STATE REASONS IN COMMENTS

_____  INFORMALLY RESOVLED - COPY TO CENTRAL FILE

_____  NO INFROMAL RESOLUTION - ADMINISTRATIVE REMEDY REQUEST FORM ISSUED

_____  IF IDC OR UDC, DATE FROM RETURN TO INMATE _____

    TEAM # _____        CODE _____

Received
(CCSD)
9/16/03 VP

                                    **Exhibit "G"**

To:        Mr. Frank T. Ishizaki,  Director of Corrections

From:      Vincent  P. Palomo, Inmate M.S.F. Post#7 A.C.F.

Subject:   Administrative Review re: <u>A.C.C. Case No. 03-08-542</u>

Reference: General Order No. 97-006, A.C.C. Policies & Procedures

           Section 27. <u>APPEAL</u> §§§27.0, 27.1(a),(b);(c) ;and 27.2

## Statement of Facts

1.        On 20, August 2003 the Adjustment Classification Committee (ACC) conducted
the 3 week Institutional Review Hearing for Case No. 03-08-542.  (see Exhibit-A)

2.        On 27, August the ACC forwarded to the Prison Security Administrator (PSA)
the committee's documented Notice of Hearing and Recommendation in the instant
case.

          ACC Recommendation:  Upgrade to Medium Level 1 Security/Custody
Classification.  (see Exhibit-A)

3.        On 02, September 2003 the acting PSA Captain J.Q. Tupaz, disapproved the ACC's
recommendation in Case No. 03-08-542.

          Official Action:  Severity of offense noted although ACC cites past accom-
plishments as positive, Inmate must recognize that all the justification provided
nor the sanctions imposed prevented him from acting out inappropriately.  To
promote at this time is not conducive to safety, security and  good institutional
order.  Shall remain at Max Level III.  (see Exhibit-A)

4.        On 03, September the inmate received his copy of  the ACC's Notice of Hearing
and Recommendation/Official Action. (see Post#7 Log/Sheet)

5.        It is apparent through the acting PSA's language and actions that he disagrees
with  the DHB and the ACC's handling of Case No. 03-08-542 and that the acting PSA
has resorted to use custody designation for further punishment upon the inmate.

6.        The acting PSA's decision in the instant case raises the question as to
whether an appropriate sanction was imposed to the contrary of the existing
procedural due-process  requirements and  safeguards as established in:
          a.   Executive Order 94-19 Chapter 3 Section 3.3. <u>PURPOSE</u> §(A),(2),(3);(4)
               and   §(C),(1);(2)
          b.   Executive Order 97-05  Chapter 4 Section 4.1 GENERAL PROVISION,
               Section 4.3 CUSTODY DESIGNATION and Section 4.10 ADJUSTMENT
               CLASSIFICATION  COMMITTEE.

7.        The acting PSA's decision imposed upon the life and limb of the inmate, a
double punishment for a code violation inwhich the inmate had previously completed
a sanction for  the same offense in disciplinary segregation at the Special
Housing Unit from 26, April to 06, July 2003.  (see Exhibits-A,B;C)

8.        That the governmental interest involved through the action of the acting PSA
was not supported by the totality of the circumstances  in the instant case, or on
the value  of the procedural requirements, as well as the respect and  official
adherence to the constitutional protections  of the abovementioned  clearly
established rights, state  created interest, and laws...

9.     Although currently in a designated classification level  the inmate remains
confined at Maximum Security Facility  Post#7 under punitive conditions of daily
23 hour lock-downs,  1 hour out of cell (approx. 6'X10') in constant restraints
(leg-iron) even during scheduled exercise periods, and no forensic or educational
programmings available for progress or as an incentive in the  classification mode.
Moreover, these conditions of confinement exposes the inmates housed in this unit
to the potential of  violence  and hinders rehabilitation.

## Grounds for Relief

10.     The incident which occurred on 21, April 2003 was a isolated  case which
resulted  in no-physical contact or  injuries from either party.  (see Exhibit-D)

11.     On  25, April the inmate appeared  before the DHB and pled guilty to  all the
offenses charged against him in Case No. DHB2003-04-055.  The inmate took respon-
sibility for  his inappropriate action and also extended his apologies to C.O.I.
J. Paulino, for his (inmate's) disrespect towards authority and inappropriate
outburst.  (see Exhibit-D)

12.     On 26, April the inmate began to serve the 90 day sanction in disciplinary
segregation as punishment imposed  by the DHB in  conclusion to the Hearings in
Case No. DHB2003-04-055.  (see Exhibit-B)

13.     On 06, July 2003 and  as a  result of a DHB Case Review Hearing in Case No.
DHB2003-05-055 which was conducted on 03, July 2003, the inmate's sanction in
disciplinary segregation  was lifted, and  the inmate  transferred to Administrative
Segregation status with privileges restored.  (see Exhibit-C)

14.     On 16, July the inmate appeared before the ACC for a Reclassification Hearing.
The inmate conducted a self-presentation and also included a request for assistance
in forensic programming as a means of rehabilitation towards his behavior modi-
fications.  (see ACC Minutes)

15.     On 30, July the inmate received his copy of the ACC's Notice of  Hearing and
Recommendation/Official Action in Case No. 03-07-493.
     ACC Recommendation:  Reclassified from  Medium Level 3 to Maximum Level  3.
     ACC Justification:  Severity of Code violation (codes 113, 212 and 329)
     (see Exhibit-E)

16.     On 20, August 2003 Three (3) week Institutional Review Hearing in Case No.
03-08-542, the inmate conducted a self-presentation and once again included a
request for assistance in forensic programming and  custody needs.  (see ACC Minutes)

17.     The ACC's Recommendation in Case No. 03-08-542 is reasonably related to a
legitimate penological objective on behalf of the inmate's custody and program
needs, and is  in compliance with Executive  Order 97-05 Chapter 4 §4.10 (A),(B),
(C),(D),(E) and;  (F),(1),(2),(3);(4) and §4.11 (A) Review Schedule.

18.     Where inmate classification systems are established, then classification
decisions cannot be arbitrary, irrational, or  discriminatory.  Ramos v Lamm,
485 F.Supp 122 (D Colo 1979)

19.     A state legislature may, of course, choose to require a classification system.
In such a case, corrections officials have a legal duty to comply with the
legislative dictates.  Cooper v. Gwinn, 298 SE2d 781 (W Va 1981)

Case 1:04-cv-00013     Document 1     Filed 03/17/2004     Page 29 of 66

20.    The use of mandatory language in establishing classification or classi-
fication procedures is strong evidence of the intent of the legislature or
administrative body to create a protected liberty interest in the classification
or placement.  Knight v Armontrout, 878 F2d 1093 (8th Cir 1998).

21.    Executive Order 97-05 Chapter 4 Classification of Inmates.
§4.3 Custody Designations
       Custody designations strive to place the inmate in an environment consistent
with his behavior.  Custody designations are not to be imposed as a form of
punishment.  As much as possible, custody designation should have an objective,
behavior-oriented foundation.  Custody level refers to the degree of staff
supervision an inmate requires and the type of housing an inmate is assigned to.

22.    Executive Order 97-05 Chapter 4 Classification of Inmates.
§4.10 Adjustment Classification Committee
       (A)    The Adjustment Classification Committee (ACC) shall convene to address,
review and decide on the custody and program needs of the inmates.  The ACC
will be composed of corrections personnel appointed by the Director.  The ACC
may also convene at the request of the division administrators or the Director.

23.    Executive Order 94-19 Chapter 3 Inmate Rules and Discipline.
§3.3. PURPOSE
       (A)    The purpose of the Inmate Rules and Discipline is to ensure that a plan
of inmate discipline is established within the Department.  The objectives are:
       (2)    To specify the possible sanctions that may be imposed for a code
              violation;
       (3)    To establish minimal procedural safeguards for the imposition of
              punishments;  and
       (4)    To ensure that sanctions are appropriate for the severity of the
              violation.

24.    Executive Order 94-19 Chapter 3 Inmate Rules and Discipline.
§3.3. PURPOSE
       (C)    The only two (2) bodies that can hear disciplinary cases and impose
              sanctions are:
       (1)    The Disciplinary Hearing Officer (DHO)
       (2)    The Disciplinary Hearing Board (DHB)

25.    United States Constitutional 5th Amendment Double Jeopardy Clause.

26.    United States Constitutional 14th Amendment Due-Process Clause and
Equal Protection of the Laws.


                              Relief requested


27.    Upgrade to a designated security/custody classification which meets
my custody and program needs...


       Respectfully submitted for your professional review and disposition.


                                        *Vincent Palmo*
                                        Sincerely

Case 1:04-cv-00013    Document 1    Filed 03/17/2004    Page 30 of 66

## REQUEST FOR ADMINISTRATIVE REMEDY

TO: *Mr. Frank T. Ishizaki. Director of Correctio.* Administrative Remedy Officer

FROM: *Vincent Palomo*     Housing Unit: *MYSF Post #7*

### PART A - INMATE REQUEST

Sir,

    I kindly submit my remedial request to meet with you in person, in reference to my appeal for the administrative review of All Case No. 03-08-542.

This particular appeal was forwarded to, and documented received at the Director's office on 9/17/03.

The 15 business days established through departmental policies, procedures with existing constitutional protections and caselaws in support of a prisoner's right of procedural notification of actions taken in the context of administrative review, through a written response, has since expired on 10/8/03 and unfortunately without the application of due-process provisional requirements; safeguards or protections as established through prior practices or mandates of Law...

*October 10, 2003*        *Vincent Palomo*

**Date**                                **Signature of Inmate**

### PART B- RESPONSE

Mr. Palomo,

    Please submit an agenda of issues/topics you wish to discuss with me. After I receive this agenda, I shall schedule a meeting with you.

*10/15/03*

**Date**                                **Signature of Remedy Officer**

*Director of Corrections*

**RECEIVED**
*1315 hrs.*
*10/14/03*
*10.16.03* *Pelino Post #7*

INMATE NAME: *Vincent Palomo* S/S NO.: *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* UNIT: *NVSF* DATE: *October 14, 200*

NOTICE TO INMATE: You are advised that prior to filing a Request for Administrative Remedy, you MUST attempt to informally resolve your complaint through your correctional counselor. Please follow the three (3) steps listed below:

1. STATE YOUR SPECIFIC COMPLAINT: *Violation of EO 91-19 Section 3.32.(B) in reference to my appeal for the Administrative Review of the acting PSA's official action in re: AR Case No. 03-08-562. This appeal was signed received at the Director's office on 9/17/03.*

2. STATE WHAT EFFORTS YOU HAVE MADE TO INFORMALLY RESOLVE YOUR COMPLAINT: *I have complied with the established departmental policies and procedures and EO 91-19 in the meaningful preparation and timely filing of my appeal...*

3. STATE WHAT RESOLUTION YOU EXPECT: *To meet with the individual responsible in the handling of this matter, for either a resolution of the issues, or just further exhaustions of remedies...*

INMATE SIGNATURE: *Vincent Palomo* DATE: *October 14, 2003*

CORRECTIONAL CASEWORKER'S COMMENTS (STEPS TO RESOLVE): _____

_____

_____

_____

CASEWORKER'S SIGNATURE: _____ DATE: _____

CCSD SUPERVISOR REVIEW: _____ DATE: _____

STAFF ACTION:

_____ NOT ACTED ON – STATE REASONS IN COMMENTS

_____ INFORMALLY RESOVLED – COPY TO CENTRAL FILE

_____ NO INFROMAL RESOLUTION – ADMINISTRATIVE REMEDY REQUEST FORM ISSUED

_____ IF IDC OR UDC, DATE FROM RETURN TO INMATE _____

TEAM # _____ CODE _____

**Exhibit "I"**

Response to: Mr. Vincent Palomo          10/16/2003

Reference:     Administrative Remedy – Informal Resolution Form dated October 14, 2003

Your request concerning this matter is denied.

For your information, EO94-19 Section 3.32 covers time limits for appeals concerning DHO or DHB matters and does not apply to Administrative Remedy matters.   It is further noted that the Director of Corrections does not have time limits with respect to remedy requests and the Director's decision is final.

I am most interested in resolving any issue you may have.  In fact, I previously returned another Administrative Remedy Request that your submitted to me to suggest that you give me an agenda of issues you wish to discuss.  I await your response concerning that previous matter and will, at that time, determine when I will meet with you.

Frank Ishizaki
Director

# Exhibit "J"

# Exhibit "K"

## REQUEST FOR ADMINISTRATIVE REMEDY

TO:    Mr. Frank T. Ishizaki, Director of Corrections    , Administrative Remedy Officer

FROM:    Vincent Palomo,    , Housing Unit:  MXSF Post#7

### PART A - INMATE REQUEST

Sir

   As per your response to my remedy request dated 10/15/03 in reference to my appeal for the administrative review of ACC Case No. 03-08-542. Most of the issues in which I am now addressing on this agenda have been addressed on the appeal which your office received on 9/17/03.

1. The issues in my A.C.C. appeal which I filed on 16 September 2003:
   A) E.O. 94-19 Chapter 3  §3.3 Purpose §(A), (2) ,(3); (4) and §(C), (1); (2)
   B) E.O. 97-05 Chapter 4  §4.1 General Provision, §4.3 Custody Designation and §4.10 Adjustment
      Classification Committee
   C) U.S. Constitutional 5th Amendment Double Jeopardy Clause
   D) U.S. Constitutional 14th Amendment Due Process Clause and Equal Protection Clause
2. Your failure to respond to my appeal pursuant to E.O. 94-19 §3.32.(B) and G.O. 97-006 A.C.C. Policies & Procedures §27.4
3. Equal Protection in my case as it pertains to a similarly situated inmate with a similar disciplinary case.

October 21, 2003
Date

*Vincent Palomo*
Signature of Inmate

### PART B - RESPONSE

Date

Signature of Remedy Officer

--------------------------------(CUT ON LINE)--------------------------------

### PART C - RECEIPT

Return to    Vincent Palomo    , Housing Unit    Post #7



# DEPARTMENT OF CORRECTIONS
*Depattamenton Mangngurihi*
P.O. Box 3236
Hagatna, Guam 96932

# Exhibit "L"

**Felix P. Camacho**
*Governor*

**Kaleo S. Moylan**
*Lt. Governor*

**Frankie T. Ishizaki**
*Director*

**Robert D. Camacho**
*Acting Deputy Director*

**Francisco B. Crisostomo**
*Warden*

**Michael P. Quinata**
*Chief Parole Officer*

**Luis M. Paulino**
*Administrative Services Officer*

NOV 1 3 2003

## MEMORANDUM

To:        Inmate Vincent Palomo

From:      Director Of Corrections

Subject:   Remedy Request dated October 21, 2003
           Ref:   Administrative review of ACC Case No. 03-08-542

This letter is a response to your request for administrative review which you had filed on September 16, 2003, has been reviewed. The following issues were raised in your grievance:

You cited the following:

    a. E.O. 94-19 chapter §3.3 Purpose, (A) 2, 3 and (C)1and 2,
    b. E.O. 97-05 chapter 4 §4.1 General provision §4.3. Custody designation and §4.10 Adjustment and Classification Committee.
    c. Double Jeopardy Clause
    d. Due Process and Equal Protection Clause
    e. Failure to respond to your ACC appeal pursuant to E.O. 94-19 §3.32 and G.O. 97-006 ACC policies and procedures.
    f. Equal protection in your case as it pertains to a similar situated inmate with a similar disciplinary case.

The following have been determined.

1.     With respect to E.O. 94-19, §3.3 Purpose. The purpose of the inmate rules and discipline is to ensure that a plan of inmate discipline is established within the department. Although you cited (A) 2 and 3, you failed to cite (A)1 <u>of which the purpose is to define and give notice of unacceptable behavior.</u>

    a. You pled guilty to the incident that caused sanctions to be placed against you, which included a referral to the ACC for possible reclassification.
    b. The imposition of such a sanction is well within the discretion of the DHB. By your plea you accepted the possibility of that and other sanctions being levied against you

Tel. No.: 475-6222 / 473-7026 / 7027
Fax No.: 473-7024

2. E.O. 97-05 sections 4.1, 4.3. And 4.10 deal with the classification issues and include provisions for the classification of inmates and the manner in which the ACC is to accomplish their mandates. The following facts and issues are noted:

   a. In ACC Case No. 03-07-493 reclassified you to Maximum Level 3 pursuant to a DHB referral in DHB Case No. 2003-05-055.
   b. In ACC Case No. 03-08-042, ACC recommended a reclassification upgrade to Medium Level I, however, the Acting Superintendent exercised his discretion and disapproved the recommendation citing "the severity of offense noted and that although the ACC noted past accomplishments as positive. The inmate must recognize that all the justifications did not provide nor the sanctions imposed prevented him from acting out. To promote at the time was not conducive to safety security and institutional good order. The inmate shall remain at Maximum Level 3.
   c. Section 4.3 clearly cites that custody designation strive to place the inmate in an environment consistent with his behavior... it further states that custody level refers to the degree of staff supervision an inmate requires and the type of housing the inmate is assigned to.
   d. Section 4.5. (B) 3(a) clearly indicates that it may also be used as temporary placement for inmates as a temporary placement for inmates as a result of disciplinary hearings for violations of institutional rules and regulations.
   e. Section 4.6 (B) classification model addresses custody designation should be based, where possible, on past relevant behavior. The frequency, recency, and severity of past behavior is an indicator of future similar behavior.... and that at the time of classification review, measures of institutional behavior, e.g., disciplinary reports, should replace prior considerations.
   f. Section 4.6(c) indicates that inmates should be classified to the least restrictive custody level required to protect society staff and other inmates.

3. That in its findings and by your plea you acknowledged your guilt in the case that caused those sanctions to be imposed upon you. Sanctions are clearly defined in the E.O. 94-19 please review §3.5 to 3.12 for future reference.

4. Please review G.O. 97-006 section 26.0 Recommendation to the PSA and its citations

5. Please review G.O. 97-006 section 27 and its citations.

## FINDINGS:

1. The ACC action and subsequent disapproval and override in ACC case no 03-03-524 are upheld. The acting PSA met the minimum requirements with respect to the procedures and was acting well within his authority.

2. With respect to Double jeopardy you were not retried for the same offense. The referral for possible reclassification is a sanction and the ACC procedures are clearly defined in the E.O. 94-19, E.O. 97-04, and G.O. 97-006.

3. The equal protection clause is just that

I hope this memo will clear up any issues or questions. I also hope that you will work in a positive direction and accept responsibility for your actions.

FRANK T. ISHIZAKI

ADJUSTMENT CLASSIFICATION COMMITTEE
Department of Corrections
Mangilao, Guam

NOTICE OF HEARING & RECOMMENDATIONS

**ACC MEMBERS (Present)**
[X] B.A. Lotz, Chairperson
[X] J.T. Afaisen, 1st V/Chairperson
[ ] L.M. Ortiz, Member
[X] R.A. Aromin, Member
[X] M.T. Perez, Secretary/Member

| INMATE: (Last, First, Middle Initial)<br>Turner, Daniel L. | CASE NO.:<br>03-09-622 |
|---|---|

| CURRENT CLASSIFICATION:<br><br>Medium (Level 3) | HEARING DATE:<br><br>09/24/03 | HEARING TIME: |
|---|---|---|

PROGRAM ELIGIBILITY:

[ ] Work Credits Not Eligible       [ ] Work Release Not Eligible

[ ] Education Release Not Eligible       [ ] Other_____

| TYPE/PURPOSE OF PRESENTATION:<br><br>DHB Referral 2003-05-062 and 11 Months Institutional Review per 02-05-646 and 03-05-345 | PRESENTER:<br><br>CSW R.A. AROMIN |
|---|---|

| OFFENSE:<br>CF145-89    Aggravated Murder (1st Deg.) Two Counts<br>         in the Commission of a Robbery<br>         Aggravated Murder (1st Deg.) Two Counts in the Commission of a<br>         Burglary<br>         Robbery (2nd Degree)<br>         Burglary (2nd Degree)<br>         Possession and Use of a Deadly Weapon in the<br>         Commission of Robbery (One Count)<br>         Aggravated Murder (1st Degree)<br>CF0071-90   Possession and Use of a Deadly Weapon in the Commission of a<br>         Felony | AGGREGATE SENTENCE:<br><br>Life W/O plus 25 years |
|---|---|

| PAROLE ELIGIBILITY DATE:<br><br>N/A | FULL-TIME RELEASE DATE:<br><br>N/A | TIME SERVED (As of Hearing Date):<br><br>14 years 03 months 14 days |
|---|---|---|

CORRECTION SOCIAL WORKER'S RECOMMENDATION:
CSW is requesting ACC's support to continue inmate at his present classification of Medium (Level 3) custody/security. The inmate is also encouraged to continue teaching Computer Classes and to attend college level classes if made available. The Inmate is also encouraged to participate in Forensic programs.

OTHER OFFICIAL(S) RECOMMENDATION:
[x] Unit OIC: No problems noted security reports submitted on 06-24-03. This case was a continuation from June 25, 2003, ACC Cs. No. 03-06-440.
[x] Forensic Administrator: Per report dated 09/23/03 the inmate completed Initial Mental Health Assessment, Human Sexuality Program, Anger Managment Program, Family Domestic Violence, Relapse Prevention, Substance Abuse Program, Methamphetamine program.
[ ] Work Assignment Supervisors:
[ ] Program Coordinators (Education/Chapel):
[ ] Computation:
[x] Other Official Recommendation: Dr. Kalingal's Assessment on a 30 days review while in confinement on June 20, 2003.

ACC RECOMMENDATION:
Re-classify inmate to Medium (Level 1) encourage program participation
**Next Review Schedule:** 11 months, 3 weeks is waived unless ACC is petitioned

ACC JUSTIFICATION:
Based on severity of DHB code violations. The committee took into accounts inmate good record in the last 14 years.

| VOTING:   2   YES    __ NO    __ ABSTENTION   Reason:__ |
|---|

SUBMITTED BY: _____    DATE: 9-29-03
       B.A. LOTZ, ACC CHAIRPERSON

OFFICIAL ACTION:

[X] APPROVED
[ ] DISAPPROVED      DATE: 10-3-03

REASON:

_____
J.C. TUPAZ, Acting
Prison Security Administrator

Appeal Procedures: Refer to DOC General Order No. 97-006 or ACC Policies & Procedures (03/29/96) Sect. 27.0-27.4.

Revised 10/27/98
Original     ACC File
Distribution   Inmate, Caseworker; Unit File; Superintendent; Director; PSD; DATSD; Visitation; Education; Work Assignment_____

<table>
<tr><td>

**DISCIPLINARY HEARING BOARD**
Department of Corrections
Mangilao, Guam

COPY

# REPORT

</td><td>

**MEMBERS PRESENT**
[X]  A.S. San Nicolas, Chairman
[X]  A.P. Borja, 1st Vice Chairman
[]   J.U. Pangelinan, 2nd Vice Chairman
[X]  T. King, Member
[X]  C.M. Cruz, Member
[]   L. Sanchez, Member

</td></tr>
</table>

| Inmate: (Last, First, Middle): | TYPE OF HEARING: | CASE NO: |
|---|---|---|
| Turner, Daniel | [X] Preliminary [X] Continuance [X] Final | DHB2003-05-062 |

| DATE OF INCIDENT: | DHB HEARING DATE: | PRESENTING PERSONNEL: |
|---|---|---|
| May 7, 2003 | May 11, 2003 | A.Q. Santiago, COS II |

**OFFENSE CODE:**

| | |
|---|---|
| 106: | Encouraging others to Riot. |
| 111: | Interfering with a staff member in the performance of his duties. |
| 115: | |
| 210: | Engaging in, or encouraging a group demonstration. |
| 212: | Insolence towards a staff member. |
| 221: | Interfering with a staff member in the performance of his duties. |
| 222: | Conduct which disrupts or interferes with the orderly running of the department. |
| 306: | Refusing to obey an order of any staff member. |
| 326: | Interfering with a staff member in the performance of his duties. |
| 328: | Conduct which disrupts or interferes with the orderly running of the department. |
| 329: | Using abusive or obscene language or gestures to a staff member. |

**SUMMARY OF CHARGE(S) as noted by the DHB Chairman:**
On May 7, 2003 at approximately 0552hrs, Lt. Santiago, arrived at post #18 to personally inform all inmates that only one locker was acceptable for their needs. The inmates acceptance of the information was fine. They agreed to comply with the instructions given. Santiago then checked out at 0600hrs from the unit, assuming clearance with reaching an understanding by all inmates. Yet, at approximately 0619hrs, Santiago was summoned by Central control to post #18 for a possible disturbance. Urgently Santiago requested from 2nd platoon commander for their assistance. Arriving at post #18, Santiago noticed lockers were in the hallway. Santiago then gave notice for all the lockers to be cleared with one per inmate only. But Santiago noticed Turner's absence in cubicle 2. Santiago then had to walk out of the cubicle and proceed to cubicle 1 in search for inmate Turner. Turner was the only assigned inmate of cubicle 2 not complying with the order. Santiago discontinued his work to find Turner and bring him back to his cubicle. Santiago then questioned Turner why was he not clearing his extra locker. Turner replied "I will on my time and I will Hesitantly". Santiago told Turner immediately not to make the situation harder for himself and just do as instructed. But Turners frustrated face could have explained his intentional refusal. Anyone could have seen the fire in his gesturing remark pointing his fingers directly at Santiago saying "Fuck you, you shit head". Turners reaction drew so much attention from the officers causing then to attend to his disruptive action. Therefore, Santiago had instructed the officers to escort Turner to post #6 for pre hearing detention to prevent extended and inviting disruptive behavior from his peers to join in with him.

**NOTICE OF CHARGE(S):**

A.   Advanced written notice, which shall not be less than twenty-four hours to the DHB hearing, of the charge(s) (copy of incident report) was given to Inmate on: May 10, 2003 at about 0800hrs  by CO I L. Spotanski.

B.   The DHB was held on May 11, 2003  beginning at 1020hrs and concluding at about 1104hrs on May 13, 2003.

C.   The Inmate was advised of his/her rights [hearing to be heard by an impartial board, right to be present in the hearing except during deliberations, hearing is administrative, Report of Findings by DHB within 24 hours after case is concluded] before the DHB by  CO III A. San Nicolas on  May 11, 2003   and a copy of the advisement form is on file.

**STAFF REPRESENTATIVE [COUNSEL SUBSTITUTE]:**

A.   [X] The Inmate waived his right to Staff Representation (DOC employee).

B.   [] The Inmate requested Staff Representation and _____ came before the hearing.

C.   [] The requested Staff Representative declined or could not appear but Inmate was informed of option to postpone the hearing to obtain another staff representative with the result that _____.

**PRESENTATION OF EVIDENCE:**

A.   [X] The Inmate has been advised of his/her right to present statements or to remain silent to present document, including written statements of unavailable witnesses, and for relevant witnesses to appear in his behalf at this hearing.

B.   [] The Inmate ADMITS the charge(s). Cite Codes _____

C.   [X] The Inmate DENIES the charge(s). Cite Codes  112, 210, 212, 306, 310, 329.

D.   Summary/Highlights of the hearing:  After the Inmate signed the Advisement of due process. The presenting officer was asked if he has any changes/additions or deletion to the IR. Plaintiff changed Code 115 to Code 113. Added Codes 310 and 112. The Inmate was then asked if he knows of any reason that the Board should not read of the charges(either its technical or procedural)Inmate had no reasons however, Inmate addressed the issue of the additional charges without the 24hrs notice, and that he does not have all information reports. The Chairman then called for a break to provide the inmate with the additional reports as requested. After Chairman read of the IR, the following Charges were dropped; Code 111, 113, 221, 222, 326, 328. The chair then asked the Inmate his plea to the charges of violating  Codes 112, 210, 212, 306, 310, 329. Inmate then entered a plea of Not Guilty to all charges. The Inmate was then asked if he wishes to proceed with his case this date or continue for a later date and prepare his case with the additional charges. Inmate requested to continue for a later date to prepare. Inmate then signed request for final hearing for May 13, 2003. Final hearing commenced with inmate and plaintiff present. At 0929hrs May 13, 2003 Final hearing commenced with inmate and plaintiff present. At 0929hrs May 13, 2003 Final hearing commenced with inmate and plaintiff present. Inmate was again asked if his due Process rights needs to be addressed, inmate replied "No". Hearing then continued. **To the violation of Code 112;** Plaintiff presented; referring to IR line 5 to 7. which indicates that Central Control summoned Santiago to post 18 for a possible disturbance, and that Santiago requested the assistance from 2nd platoon commander for their assistance. Plaintiff then referred to Part II of the IR, whereas the investigating officer reported that the institution was placed on look-down status

COPY

at 0621hrs on May 7, 2003, and that at least 26 officer from the 2nd platoon and other available 1st platoon officers responded to the disturbance at post # 18. Plaintiff also referred to additional reports submitted by officers G.F. Martinez, F.C. San Nicolas, C.J. Tainatongo, S.F. Cruz, A.A. Benavente, L.P. Cepeda, and M.Tudela, which supported the violation of Code 112. Rebuttal by Inmate; That the board should look into the charges because his 24hrs notice was not met for the additional charges. Inmate also explained that he did not cause the disruption, it was after the incident when he had caused a disruption. Question from TK to Inmate; You were given the reports and requested to continue your case? Inmate replied "yes". To the violation of Code 210; Plaintiff referred to IR line 14 to 21 and explained that because of Turners gesturing remarks and disruptive actions drew attention. Rebuttal by Inmate; Inmate explained that there was no group demonstration and that he was at the day room during the time of incident. To the violation of Code 212; Plaintiff referred to IR line 13 to 17, which plaintiff explained that Turners respond to not clearing his assigned locker telling Santiago "I will on my time and I will". Plaintiff also explained the negative gestures of Turner pointing at Santiago telling Santiago "Fuck you, You Shit Head". Plaintiff then referred to Part II of the IR line 5 and additional reports submitted by officers C.J. Tainatongo, C.J. Donato, Sgt D. Cruz, S.F. Cruz and M. Tudela which supports the violation. Rebuttal by Inmate; Stating that he cannot denied his actions, That everything happened spontaneously it was nothing that was planned because of his frustration and feeling provoked into this. Question from ASN to Inmate; Are you saying that you are admitting to this violation? Inmate replied " As I said in the beginning I cannot deny it". To the violation of Code 306; Plaintiff referred to IR line 8 to 16, which Santiago gave the instruction to all inmates to clear their lockers, with only (1) locker to each Inmate. Plaintiff also explained that during this time after the instructions were given that he had to search for Turner because Turner was the only one not present. Plaintiff then explained that when questioning Turner as to why he was not complying with the instructions Turner replied " I will on my own Time". Plaintiff then referred to additional reports which supported the facts which the instructions were given and that Turner was not present to comply with the instructions. Rebuttal by Inmate; Inmate explained that he did not have an extra locker, and that while returning to comply with the instructions he was stop because of his actions being belligerent, which then prevented him from complying with the instructions. To the Violation of Code 310; Plaintiff referred to IR Line 8 to 14, which indicates Santiago instructing all Inmates to clear their lockers, and that he had to search for Turner because he was the only inmate not present complying with the instructions, Plaintiff also explained that when he had found Turner he question Turner as to why he was not complying with the instructions which turner replied" I will on my own time". Rebuttal by Inmate; Inmate stated that the violation does not apply for failure to perform work as instructed by a supervisor because of the fact that Bev Lotz is my Supervisor. As for a refuse to obey an order is already on 306. And I did in fact made an attempt to move my locker but because of my act I was prevented from doing so. Statement from TK to Inmate; As far as a supervisor is concerned every officer in the institution is your supervisor, that is the nature of the job, as far as Bev Lotz, she is your supervisor, during your work detail. To the violation of Code 329; Plaintiff referred to IR line 17, which indicates Turner saying to Santiago "Fuck you, You Shit Head". Plaintiff also referred to additional reports which also supported the facts presented and witnessing what was said. Rebuttal by Inmate; inmate stated "that he cannot deny the charge I can only comment to my response on the way I behaved. It was that I have to get my ass in their and move your shit". No other presentation or comments . In closing inmate presented; That the incident wasn't intentional I did not wake up that morning intending to behave the way I did, that in the 14 years I've been here this is the first time I had an incident like this. And I am going to do my damn best for it to be my last time. I am not proud of the way I acted, I have let a lot of people down, I have been trying to work with everybody that's all I've been trying to do for these 14 years. I know I am throwing a lot of things away people were counting on me. Closing from Plaintiff; presenting that it is obvious that in the testimony of Turner that he regrets, regrets is nothing that we can go back and have an individual re-perform. Inmate Turner should have been mature enough in the situation itself. He also stated that he new that something was wrong when he saw the officers coming. He also said that the instruction was given. What gave him the idea that he can just walk out from where the instructions was given. If all the other inmates were complying with my instructions, who is Daniel Turner, not to comply with my instructions. To the fact of being the supervisor, I am the platoon commander of the shift at this time, I am responsible for every officer as well as every inmate. To reacting spontaneous of his actions, does he have anything better than to cuss at the officers, could it have been an obvious belligerent attitude, a combative attitude. Inmate also opposes to instructions given, that he wants to be in control, he wants to react and respond on his own time. No other presentation or comment, hearing concluded at 1104hrs May 13, 2003 inmate and Plaintiff were excused. Deliberation commenced thereafter and concluded at 1500hrs May 13, 2003.

E.  Witnesses requested by Inmate/Presenting Personnel:
1.  [X] The Inmate requested no witnesses.
2.  [X] The Presenting Personnel requested no witnesses.
3.  [] The following persons were called as witnesses at this hearing and appeared as requested by Inmate:_____
_____
4.  [] The following persons were called as witnesses at this hearing and appeared as requested by the presenting personnel:_____
5.  [] A summary of testimony of each witness is noted:_____
_____
6.  [] The following persons requested were not called for the reasons given:_____
_____
7.  [] Unavailable witnesses were requested to submit written statements and those statements received were considered. The witnesses and a summary of those statements were noted.
8.  [X] In addition to the Incident Report and Investigation, the DHB considered the following documents: Additional information reports attached.
9.  [] Confidential information were considered and not provided the Inmate. The Inmate was advised of the general content of the confidential information without jeopardizing the safety and security of the source.

## FINDINGS OF THE DHB:

A  [] The case was continued.
B.  [X] The act(s) was/were committed as charged. Cite Code(s) 112, 212, 306, 310, 329.
C.  [X] The following act(s) was/were dismissed. Cite Code(s) 106, 113, 210, 221, 222, 326, 328.
D.  [] No prohibited act(s) was/were committed. Order expungement of record.

**SPECIFIC EVIDENCE RELIED ON TO SUPPORT FINDINGS:**



1. Incident report submitted.
2. Investigating officer findings.
3. Additional informational reports submitted by witnessing officers.
4. Inmate Not denying the violation of Codes 212, 310, 329.
5. Although the inmate claims the incident was not intentional, That the event was just spontaneous because of the frustration of the instruction given, his actions, if not controlled may have caused a much more serious incident.

**SANCTIONS/ACTIONS TAKEN:**

Upon receipt of this report Inmate shall be taken out of pre-hearing detention and placed in Disciplinary Segregation for a total of (130) days for code violations as follows; Code 112(60) days, Code 212(30) days, Code 306 (15) days, Code 306 (15) days, Code 310 (15) days, and Code 329 (10) days. All shall run consecutively in accordance to Ex. Or. 94-19 sec. 3.12 (C)(1). Also that while in Disciplinary Segregation all privileges are removed with exception of attorney calls of record and emergency calls which shall be verified by the Officer in charge.

It is also recommended that upon release from Disciplinary Segregation that the Adjustment and classification committee conduct a review for possible reclassification for a lower step level in pursuant to section IV(I) of G.O. 99-003.

**REASON FOR SANCTIONS/ACTIONS TAKEN:**

Maximum allotted days of segregation for violation of Greatest misconduct is (365) days.
Maximum allotted days of segregation for violation of High misconduct is (180) days.
Maximum allotted days of segregation for violation of Moderate misconduct is (60) days.

**APPEAL RIGHTS**

[X] The Inmate has been advised during the initial hearing of his/her right to appeal this action within 15 calendar days from receipt of the DHB REPORT to the Director of Corrections. Inmate is further advised that a plea of guilty to any or all code violation(s) is not appealable or whenever, a plea or sanctions is negotiated between Inmate and DHB.

**CERTIFICATION OF DHB REPORT:**

DHB Chairman ___A.S. San Nicolas, CO III___    Date:__May 14, 2003___    Time: 0845hrs.

**ACKNOWLEDGMENT OF DHB REPORT:**
A copy of this DHB Report has been given to the Inmate.

Inmate's signature _____    Date: _14 May 03_   Time: _1841_

Original :    **DHB File**
Copies:      **Inmate; Presenting Personnel, Director, Warden, ACC, CCSD, DATS, PSD.**

Acting P.S.A.

INMATE NAME: Vincent Palomo, S/S NO. 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 UNIT: MVSF DATE: October 15, 2003
Test #7

NOTICE TO INMATE: You are advised that prior to filing a Request for Administrative Remedy, you MUST attempt to informally resolve your complaint through your correctional counselor. Please follow the three (3) steps listed below:

1. STATE YOUR SPECIFIC COMPLAINT: Forensic Programs are only made available for inmates in the general prison population, which is a practice that discriminates upon the Maximum Custody Classification inmates whom are also interested, and in need of forensic programming.

2. STATE WHAT EFFORTS YOU HAVE MADE TO INFORMALLY RESOLVE YOUR COMPLAINT: I have requested directly during ALL hearing for enrollment in forensic programming. (twice)
I have waited for a schedule and a sign-up sheet to be posted on this unit's bulletin board... It never materialized

3. STATE WHAT RESOLUTION YOU EXPECT: Pursuant to the General Order 97-012 Inmate Institutional Activities, Maximum Custody Classification inmates are authorized forensic programs.
   To be treated impartially pursuant to EO 94-19 Chapter 3 Section 3.2 (A)

INMATE SIGNATURE: Vincent Palomo          DATE: October 15, 2003

CORRECTIONAL CASEWORKER'S COMMENTS (STEPS TO RESOLVE): _____
_____
_____
_____
_____

CASEWORKER'S SIGNATURE: _____    DATE: _____
CCSD SUPERVISOR REVIEW: _____    DATE: _____

STAFF ACTION:

_____ NOT ACTED ON - STATE REASONS IN COMMENTS

_____ INFORMALLY RESOVLED - COPY TO CENTRAL FILE

_____ NO INFROMAL RESOLUTION - ADMINISTRATIVE REMEDY REQUEST FORM ISSUED

_____ IF IDC OR UDC, DATE FROM RETURN TO INMATE _____

TEAM # _____          CODE _____

**Exhibit "N"**

ADMINISTRATIVE REMEDY - INFORMAL RESOLUTION FORM

*27 oct 05*
*1258 hrs.*

TO: Mr. Frank T. Ishizaki,
   Director of Corrections          DEPARTMENT OF CORRECTIONS

INMATE NAME: Vincent Palomo___ S/S NO.: 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___ UNIT: MXSF Post#7 DATE: 10/27/03

*Director's Office*
**RECEIVED**
*10-31-03*
*MClino*

NOTICE TO INMATE: *DTSP*          You are advised that prior to filing a Request for Administrative
OCT 28 2003          Remedy, you **MUST** attempt to informally resolve your complaint
          through your correctional counselor. Please follow the three (3)
          steps listed below:

1. STATE YOUR SPECIFIC COMPLAINT: _Failure of the acting PSA Captain J.Q. Tupaz, in not complying with_
   _EO 94-19 §16.2. (B) and (C) in regards to the grievance complaint addressed at his level on October 15, 2003._
   _(See attached copy)_

2. STATE WHAT EFFORTS YOU HAVE MADE TO INFORMALLY RESOLVE YOUR COMPLAINT: _____
   _I have complied with the standards as set forth in EO 94-19 §16.2. (A) (See attached copy)_

3. STATE WHAT RESOLUTION YOU EXPECT: _For the official compliance of the Rules and Regulations as set_
   _forth and established in EO 94-19 §16.2. (B) and (C)_

   INMATE SIGNATURE: _Vincent Palomo_ DATE: _10/27/03_

   CORRECTIONAL CASEWORKER'S COMMENTS (STEPS TO RESOLVE): _Casework manager & Capt Tupaz will design a_
   _program for max level 3 inmates._

   CASEWORKER'S SIGNATURE: _____ DATE: _11/4/03_
   CCSD SUPERVISOR'S REVIEW: _____ DATE: _____

   STAFF ACTION:
   _____ NOT ACTED ON - STATE REASONS IN COMMENTS
   _____ INFORMALLY RESOLVED - COPY TO CENTRAL FILE
   _____ NO INFORMAL RESOLUTION - ADMINISTRATIVE REMEDY REQUEST FORM ISSUED
   _____ IF IDC OR UDC, DATE FROM RETURN TO INMATE _____
   TEAM #_____ CODE _____

   **Exhibit "O"**

# APPENDIX
# EXCERPTS OF RELEVANT
# ADMINISTRATIVE LAW & RULES

| **GENERAL ORDER** | **Date of Issue:** December 21, 1999 | **Effective Date:** December 31, 1999 | **No:** 99-003 |
|---|---|---|---|
| **Index As: Disciplinary Procedures** | | **Rescinds: G.O. 97-07** | |

**TO:**        **Inmates and Personnel**

**FROM:**      **Director of Corrections**

**SECTION I: INTRODUCTION**

A.    **PURPOSE**
These procedures have been prepared as a guide for the administration and operations of the Disciplinary Hearing Board (DHB) and the Inmate Appeal Process of DHB decisions and actions.

B.    **LEGAL BASE**
The DHB and the Inmate Appeal Process are the creation of the Director of Corrections, whose authority to create such entities is mandated by Sections 3.3(C)(2) and 3.30-3.32 of the Rules and Regulations for the Administration of Correctional Institutions and Other Places of Confinement, as promulgated by Executive Order 94-19 on December 30, 1994. Statutory provisions for these Rules are found in Sections 90.30 and 90.35 (c) of the 9 Guam Code Annotated.

C.    **SCOPE**
The provisions herein apply to all members of DHB and all inmates confined under the custody and care of the Director, as well as to Personnel directly or indirectly involved with the operations or administration of the DHB and Inmate Appeals process.

D.    **GOALS**
The disciplinary hearing is a process which tailors punishment for specific rule violation, while maintaining institutional order and ensuring respect for rules and rights of others.

Inmate discipline will be applied in an impartial and consistent manner. The inmate's past records and the punishment's effect on future behavior should be taken into consideration. Upon an inmate's misconduct, disciplinary action will be taken as soon as circumstances will permit.

It is important that a copy of these rules and procedures, containing disciplinary rules and a list of all chargeable offenses, be made available to inmates.
The Inmate Appeals process allows for procedures by which inmates may seek the formal review of decisions taken by the DHB.

Case 1:04-cv-00013     Document 1     Filed 03/17/2004     Page 45 of 66

and all documents reviewed. Copies will be given to the Presenting Personnel and Adjustment & Classification Committee.

The evidence supporting the findings may not be given to the inmate if it would jeopardize departmental security.

H.    **REVIEW OF INMATE WHILE IN DISCIPLINARY SEGREGATION**

1.    The inmate confined in Disciplinary Segregation shall be interviewed concerning their mental and physical health within 30 days of confinement, and every 30 days thereafter until released from Disciplinary Segregation. This assessment will be performed by the Forensic Services.

2.    A review by DHB may be conducted when the inmate, Forensic Services, physician or Division Head submits the request.

3.    The minimum of 30 calendar days must be served by the inmate in Disciplinary Segregation before a review can be conducted. However, a request for review can be filed beforehand.

4.    DHB may shorten the inmate's time of confinement in Disciplinary Segregation upon being satisfied that the inmate is remorseful and desires to conform to prison rules or due to health reasons.

5.    A subsequent review may be set by DHB after the initial review of the inmate while in Disciplinary Segregation.

6.    DHB may recommend any of the following:

a.    Suspend any portion of the original sanction imposed. Should the inmate be released from Disciplinary Segregation before the expiration of the original time given, he/she will serve the balance on probation.

b.    Commute to time serve.

c.    Affirm the original findings of the DHB and continue the inmate until he/she serves out the sanctions imposed or set another review date.

I.    **REFERRAL OF DHB CASES TO THE ADJUSTMENT & CLASSIFICATION COMMITTEE**

1.    A plea of Guilty or a finding of Guilty by the DHB requires an automatic

review of the case to consider any recommendation(s) of DHB for a possible reclassification to a lower classification.

2.  The Adjustment & Classification Committee has 15 calendar days to review the inmate for possible reclassification from the inmates release from Disciplinary Segregation.

**SECTION V** **THE FOLLOWING ACTS CONSTITUTE GENERAL VIOLATIONS OF RULES AND REGULATIONS** (Extracted from Executive Order 94-19 Sections 3.5, 3.6, 3.7, 3.9).

A.  **PROHIBITED ACTS: GREATEST MISCONDUCT**

**CODE**      **PROHIBITED ACT**

100         Killing

101         Assault with Injury (including any sexual assault)

102         Escape from escort; escape from any housing unit; or escape with violence.

103         Setting a fire (charged with this act in this category only when found to pose a threat of serious bodily harm or in furtherance of a prohibited act of Greatest Misconduct, e.g., escape or riot. Otherwise, the charge is properly classified in Codes "200" or "300" Misconduct Series).

104         Possessing, manufacturing, or introducing a weapon such as a gun, knife, sharpened instrument, dangerous chemical, explosive, or any ammunition, or any instrument that would cause harm.

105         Rioting.

106         Encouraging others to riot.

107         Taking hostage(s).

108         Possessing, manufacturing, or introducing hazardous tools (tools most likely to be used in an escape or escape attempt or to serve as weapons capable of doing serious bodily harm to others; or those hazardous to departmental security or personal safety).

109         Possessing, introducing, manufacturing, or using alcohol, drugs, or any controlled substance not prescribed for the individual by a medical doctor.

| GENERAL ORDER | Date of Issue: 03/10/97 | Effective: 03/29/96 | No. 97-006 |
|---|---|---|---|
| Reference: | | Rescinds: NONE | |

Index As:

## ADJUSTMENT CLASSIFICATION COMMITTEE
### Policies and Procedures

**SUBJECT:**   Departmental Policies and Procedures

**PURPOSE:**   To meet present Departmental goals toward rehabilitation and reintegration of inmates.

## THIS ORDER CONSISTS OF THE FOLLOWING NUMBERED SECTIONS:

Attached and made a part of this General Order are the Policy and Procedure of the Adjustment Classification Committee.

J.A. TORRE
Deputy Director of Corrections

Attachments

23. **DHB REFERRAL OF CASES**

23.0   All DHB cases wherein the inmate was found guilty or entered a plea of guilty shall automatically be reviewed by the ACC.

23.1   The ACC shall review recommendations from the DHB for possible demotion in classification as a result of disciplinary action.

23.2   No inmate serving disciplinary confinement shall be reviewed by the ACC. Upon receipt of the DHB Report of Findings and Decisions, and notice of the inmate's release from disciplinary segregation the ACC Chairperson shall schedule a review of the inmate's case. This review shall be conducted within fifteen (15) calendar days of release from disciplinary segregation.

23.3   Pending an ACC review, an inmate will be placed on a temporary classification status (Administrative Segregation) until the ACC has concluded the review. The final decision by the PSA shall be given the inmate within 72 hours of that decision.

23.4   The Unit Managers shall jointly make a presentation of the inmate before the ACC for possible custody/security reclassification.


24. **CONTINUANCES AND SUSPENSION**

24.0   The inmate or Case/Security Managers may be allowed a continuance to prepare for the presentation, when approved by the Chairperson. Continuances may not exceed seven (7) business days. In certain cases, when both the presenter and the inmate agree, the continuance may be granted for a longer period but not to exceed thirty (30) calendar days.

24.1   Other continuances may be granted by the ACC for good cause and under exceptional circumstances. The ACC can suspend the hearing in emergency situations (i.e. typhoons, earthquakes, prison riots or disturbances, etc.). The Chairperson shall document the nature of the delay and reasons.


25. **INMATE PRESENCE AT THE HEARING**

25.0   The inmate shall be advised of his/her hearing before the ACC not less than twenty-four (24) hours prior to the actual hearing.

25.1   Inmates shall appear in person at all classification hearings that may affect his/her custodial status, treatment/training program, legal status and/or work assignment.

26.3 The PSA or his designee shall document the decision for any disapproval of a recommendation and the reason(s) for such. The written decision shall be given to the inmate within the time specified.

27. **APPEAL**

27.0 Upon receipt of the PSA decision of the ACC recommendation, the inmate may file an appeal no later than fifteen (15) calendar days. The appeal shall be in writing.

27.1 The inmate's appeal should be written in three sections:

    (a)    Statement of facts;

    (b)    Grounds for relief; and

    (c)    Relief requested

27.2 Appeals on decisions and action taken by the ACC or the PSA (or his designee) shall be made to the Director through the grievance procedure.

27.3 Decisions by the Director on appeals are final.

27.4 Appeals must be answered within fifteen (15) business days of receipt. Should the Director not answer an appeal after the inmate's appeal has been filed, the appeal becomes moot.

28. **REVIEW SCHEDULE**

28.0 The inmate will be given notice not less than twenty-four (24) hours prior to the hearing before ACC and may waive, in writing, the waiting period or appearance before the Committee.

28.1 Reviews of inmate cases shall be made and conducted by the ACC according to the following:

    (a)    Within 3 weeks of an inmate's assignment to a unit.

    (b)    At least once every 3 to 5 months for inmates serving terms less than 18 months.

| GENERAL ORDER: | Date of Issue: 06/18/97 | Effective: 06/22/97 | No. 97-012 |
|---|---|---|---|
| Reference: Executive Order #97-05 (1997) | | Rescinds: | |
| Index As: | Inmate Institutional Activities | | |

SUBJECT: Inmate Institutional Activities

PURPOSE: To establish inmate institutional activities which would differentiate the type of activities for each inmate's security level classification in accordance with Executive Order #97-05.

**THIS ORDER CONSISTS OF THE FOLLOWING NUMBERED SECTIONS:**

    I.     OBJECTIVE

    II.    POLICY

    III.   PROCEDURES

I.    **OBJECTIVE:**

To ensure that all inmates are afforded with the authorized privileges and activities as required by law.

II.   **POLICY:**

The policy of the Department of Corrections is to ensure that all inmates in the custody of the Director of Corrections are afforded the privileges and activities as mandated by their respective security level classification.

III.  **PROCEDURES:**

The following are privileges and activities for all inmates as authorized in accordance with their individual security level classification.

    A.   **Minimum-In Custody Level Classification:**

        1.    Inmates in this classification have demonstrated positive behavior and attitude, therefore, they are authorized the following activities:

|  |  |  |
|---|---|---|
| m | Approved Work Assignment | As schedule |
| n. | Day room Activity | As schedule |
| o. | Library Activity | As schedule |

2. Escort/Supervision Requirements:

   a. Inmates in this level may pose frequent behavioral or emotional problems requiring intervention or supervision by corrections personnel.

   b. When leaving the institutional grounds, inmates in this level must be escorted by a corrections officer and kept in restraints.

E. **Maximum Level-3 Custody Classification:**

1. Inmates in this level are authorized the following:

| | | |
|---|---|---|
| a. | Meals | Catered and fed in individual cells |
| b. | Contact Visitation | As schedule |
| c. | In-House Education | Through correspondence courses only |
| d. | Religious Activity | Through Administrative Remedy Request. Direct escort and supervision. |
| e. | Canteen Privileges | As schedule/under direct escort |
| f. | Recreation | As schedule/under direct escort |
| g. | Barber Shop Activity | As schedule/under direct escort |
| h. | Forensic Programs:<br>1] Anger Management<br>2] Drug and Alcohol<br>3] ICE Rehabilitation Group<br>4] Stress Management<br>5] Domestic Violence | As schedule/conducted in housing unit on a one to one basis and under direct escort. (Applies to all programs) |
| i. | Counseling Programs | As schedule/conducted at the discretion of the Caseworker |
| j. | Medical | As per medical staff instruction/conducted at the Infirmary under direct escort. |
| k. | Dental | As per dental staff instruction/conducted at the Infirmary under direct escort |
| l. | Psychological Services | As schedule with direct supervision |
| m | Day room Activity | As schedule with direct supervision |

n.   Library Activity             Through Administrative Remedy Request materials and correspondence delivered to housing unit by library personnel.

2.   Escort/Supervision Requirements:

    a.   Inmate's day movement inside the perimeter shall only be under direct escort while night movement shall require written instructions from the supervising unit officer.

    b.   Constant supervision calls for all movement and requires escort.

    c.   When leaving the institutional grounds, an armed two-on-one escort will be used and the inmate shall be in full restraints.

**F.   Maximum Level-2 Custody Classification:**

1.   Inmates in this level have shown a significant improvement in behavior and attitude and are actively participating in programs within the maximum housing unit. The following activities are approved for the inmates in this level:

| | Activity | Description |
|---|---|---|
| a. | Meals | Catered and fed in individual cells |
| b. | Contact Visitation | As schedule |
| c. | In-House Education | Through correspondence courses only |
| d. | Religious Activity | Through correspondence courses only |
| e. | Canteen Privileges | As schedule/under direct escort |
| f. | Barber Shop Activity | As schedule/under direct escort |
| g. | Recreation | Conducted within assigned unit in designated area |
| h. | Forensic Programs:<br>1] Anger Management<br>2] Drug and Alcohol<br>3] ICE Rehabilitation Group<br>4] Stress Management<br>5] Domestic Violence | As schedule/conducted in housing unit on a one to one basis and under direct escort. (Applies to all programs) |
| i. | Counseling Programs | As schedule/conducted at the discretion of the Caseworker. |
| j. | Medical | As per medical staff instruction/conducted at the Infirmary under direct escort. |
| k. | Dental | As per dental staff instruction/conducted at the Infirmary under direct escort. |



TERRITORY OF GUAM
OFFICE OF THE GOVERNOR
AGAÑA, GUAM 96910
U.S.A.

### EXECUTIVE ORDER NO. __94-19__

*AMENDING EXECUTIVE ORDER 88-19*

## APPROVAL OF RULES AND REGULATIONS
## OF THE DEPARTMENT OF CORRECTIONS

WHEREAS, the Director of Corrections, as authorized by 9 Guam Code Annotated, §90.30, has seen fit to adopt revised rules and regulations for the administration of the correctional institutions and other places of confinement; and

WHEREAS, these rules and regulations are needed for the efficient operation of the correctional institutions and for the treatment, care and reformation of the inmates thereof.

NOW, THEREFORE, I, JOSEPH F. ADA, Governor of the Territory of Guam, by virtue of the authority vested in me by the Organic Act of Guam, as amended, and in accordance with my authority under the above-cited statute, hereby approve, as attached hereto, the Rules and Regulations of the Department of Corrections for the Administration of Correctional Institutions and Other Places of Confinement, to be effective as of the date of signing of this Order.

SIGNED AND PROMULGATED at Agana, Guam, this ___30th___ day of December, 1994.

JOSEPH F. ADA
Governor of Guam

COUNTERSIGNED:

FRANK F. BLAS
Lieutenant Governor of Guam

# CHAPTER 3
# INMATE RULES AND DISCIPLINE

SECTION 3.1.  GENERAL PROVISIONS

It is the policy of the Department of Corrections to have in place in each of its facilities a system of inmate discipline that serves to protect the public, inmates, and staff members, and maintains order in the facility, through the impartial application of a fully developed, well-understood set of rules and regulations and a hearing procedure that incorporates all applicable due process requirements.

SECTION 3.2.  INMATE RIGHTS AND RESPONSIBILITIES

It is the policy of the Department of Corrections to establish rules and regulations that would create a balance between the inmate's expression of his rights and the preservation of institutional order.  This section shall generally describe the inmate's rights, as well as responsibilities, while confined in the Department's facilities.  The following is a description of these rights and responsibilities

(A)  YOU HAVE THE RIGHT to expect that as a human being you be treated respectfully, impartially, and fairly by all personnel.

YOU HAVE THE RESPONSIBILITY to treat others, both employees and inmates, with respect, impartiality, and fairness.

(B)  YOU HAVE THE RIGHT to be informed of the rules, procedures and schedules concerning the operation of

4

(B) Appeals on decisions and actions taken by the DHB shall be made to the Director of Corrections through Administrative Remedy Request procedures. The following considerations shall be made:

(1) Whether the DHB substantially complied with the rules and regulations on inmate discipline;

(2) Whether the DHB based its decision on the preponderance of the evidence; and

(3) Whether an appropriate sanction was imposed.

(C) The inmate's appeal should be written in three (3) sections:

(1) Statement of Facts;

(2) Grounds for Relief; and

(3) Relief Requested.

(D) Decisions by the Director and the Prison Security Administrator on appeals are final.

## SECTION 3.31. NOT APPEALABLE

The inmate and/or staff representative will be allowed to review the disciplinary hearing documents for purpose of the appeal. The following are not appealable:

(a) A plea of guilty; and

(b) A plea or sanction which is negotiated.

## SECTION 3.32. TIME FOR APPEALS

(A) Upon receipt of the notice of decision by the DHO or the DHB, the inmate may appeal the decision to the Prison

27

Security Administrator or the Director of Corrections. Appeals must be filed no later than fifteen (15) calendar days after the receipt of action in written form.

(B) Appeals of disciplinary hearings must be answered within fifteen (15) business days of receipt.



## EXECUTIVE ORDER NO. 97-05

**RELATIVE TO RESCINDING CHAPTER 4 "CLASSIFICATION OF INMATES" OF EXECUTIVE ORDER 94-19 AND PROMULGATING A NEW CHAPTER 4 TO MEET PRESENT DEPARTMENTAL GOALS TOWARD REHABILITATION AND REINTEGRATION.**

**WHEREAS,** Executive Order 94-19 contains rules and regulations for the Department of Corrections, and Chapter 4 of those rules and regulations provides for the classification of inmates; and

**WHEREAS,** since the approval of Executive Order 94-19 on December 30, 1994, it is now necessary to make changes to Chapter 4 to further enhance rehabilitative needs and classification of inmates for better institutional management; and

**NOW, THEREFORE, I, CARL T. C. GUTIERREZ,** Governor of Guam, by virtue of the authority vested in me by the Organic Act of Guam, as amended, do order:

1. Chapter 4, CLASSIFICATION OF INMATES, of the rules and regulations for the Department of Corrections, promulgated in Executive Order No. 94-19, is rescinded.

2. A new Chapter 4, CLASSIFICATION OF INMATES, of Executive Order 94-19, is approved and promulgated, to read:

### "CHAPTER 4
### CLASSIFICATION OF INMATES

SECTION 4.1 GENERAL PROVISIONS

The classification process of a person committed to the custody of the Director of Corrections shall be uniformly applied beginning at intake and shall continue throughout the time the inmate is incarcerated.

SECTION 4.2 ADMISSION AND ORIENTATION UNIT

Inmates remanded to the custody of the Director of Corrections shall initially be assigned to the Admissions and Orientation Unit (A & O) pending classification.

SECTION 4.3 CUSTODY DESIGNATIONS

Custody designations strive to place the inmate in an environment consistent with his behavior. Custody designations are not to be imposed as a form of punishment. As much as possible, custody designations should have an objective, behavior-oriented foundation. Custody level refers to

EO97-05/DOC
Rescind and Promulgate
   Chapter 4, EO94-19
   Classification of
   Inmates
Page   -2-



the degree of staff supervision an inmate requires and the type of housing an inmate is assigned to.

## SECTION 4. 4  LEVELS OF CLASSIFICATION

The Department of Corrections has eleven (11) levels of inmate classification.

(A)     Unclassified
(B)     Maximum (Level 1)
(C)     Maximum (Level 2)
(D)     Maximum (Level 3)
(E)     Medium (Level 1)
(F)     Medium (Level 2)
(G)     Medium (Level 3)
(H)     Minimum (In)
(I)     Minimum (Out)
(J)     Community Corrections
(K)     Pre-Release

## SECTION 4.5  DESCRIPTION OF LEVELS OF CLASSIFICATION

(A)     Unclassified

1.   This classification is reserved for newly admitted inmates remanded to the custody of the Director of Corrections.

2.   During the initial incarceration, the inmate will undergo a physical examination, an initial psychological assessment, initial interviews, and evaluation and observation by corrections personnel. The Corrections Social Worker will complete an initial classification summary, and compile other data needed for planning, evaluation, monitoring or reporting purposes.

3.   The initial classification of an inmate is normally completed during the first Thirty (30) days of receipt of intake documents by the Corrections Social Worker. In exceptional cases (which must be documented) where circumstances and situations require an extension, the Corrections Social Worker Administrator may extend the period beyond the Thirty (30) days but not exceed Fifteen (15) additional days.

4.   The Adjustment Classification Committee shall assign the initial custody classification of newly admitted inmates. All initial classification shall place inmates in Maximum      (Level 1) or Medium (Level 1) except as follows: inmates serving Twelve (12) months or less, with no prior conviction(s), no prison recidivism record, may be assigned a classification level higher than Medium (Level 1).

5.   Other than services directly related to the initial evaluation process, unclassified inmates shall be limited to housekeeping assignments within the immediate proximity of their confinement cell/housing and under constant supervision by a Corrections Officer. Housing for unclassified inmates shall

EO97-05/DOC
Rescind and Promulgate
    Chapter 4, EO94-19
    Classification of
    Inmates
Page   -3-



normally be single cell units. All inmate movement shall be escorted by a Corrections Officer. During this initial period of incarceration the inmate will receive no visitors until after the inmate is classified.

(B)   Maximum Custody/Security Classification

This classification is for inmates who have committed a violent crime (i.e. murder, armed robbery, aggravated assault, criminal sexual conduct, crimes involving the use of explosives, kidnapping, and escape) in the 2nd degree or higher offense. This classification requires housing separate from the general population and implies separate management of various activities. An inmate placed in a maximum custody/security classification shall be housed in a single occupancy cell. The maximum custody/security inmate may retain personal property unless the Prison Security Administrator (PSA) finds and documents that removal of specific items of personal property is essential for personal safety or for the safety of others. Inmates in this classification shall have limited privileges (i.e. visiting, library, recreation, etc.)

The inmate's day movement inside the perimeter shall only be under direct escort while night movement shall also require documented special orders from the supervising officer of the unit. General supervision calls for all movement to be escorted. When leaving the institutional grounds, an armed one-on-one escort will be used and the inmate shall be in full restraints.

1.   Maximum (Level 1)

   (a)   This level is for inmates whose past assaultive or escape history indicates a need for very close control. Inmates in this category are considered serious threats to the community, to corrections personnel, or to themselves.

   (b)   Inmates assigned to this level shall have access only to specific programs in which appropriate supervision can be maintained, usually in the inmates' cell or area adjacent thereto.

2.   Maximum (Level 2)

   (a)   This level is usually reserved for inmates who have shown a significant improvement in behavior and attitude based on documented security observation reports while in maximum (level 1).

   (b)   Inmates assigned to this level are actively participating in programs within the maximum housing unit.

3.   Maximum (Level 3)

   (a)   This level is usually reserved for inmates in maximum custody/security classification and who have continued to maintain positive behavior and attitude. It may also be used as a temporary placement for inmates as a result

EO97-05/DOC
Rescind and Promulgate
    Chapter 4, EO94-19
    Classification of
    Inmates
Page   -4-



of disciplinary hearings for violations of institutional rules and regulations.

(b)     Should an inmate be recommended to move out of maximum classification, the initial promotion can only be to Medium (Level 1).

(c)     A move out of maximum custody/security classification shall normally be initiated at the request of the PSA, the institutional physician or forensic unit personnel.

C.     Medium Custody/Security Classification

Housing for medium custody/security inmates may be either single cell units or dormitories where the areas are secure and designated for this purpose. Medium classification shall also include a secure perimeter, together with some form of external patrol.

Inmates assigned to medium classification shall be eligible for programs and activities within the main perimeter of the Adult Correctional Facility (ACF). Inmates are permitted to move about within the institution and shall be within frequent view of corrections personnel. Inmates may be permitted to leave the institution to seek medical attention or for other extenuating circumstances and only when accompanied by corrections personnel.

1.     Medium (Level 1)

(a)     This level is for inmates who do not require the management of maximum classification. Inmates in this level may pose frequent behavioral or emotional problems requiring intervention or supervision by corrections personnel. Inmates have access to selected work assignments, programs, and activities inside the perimeter of the Adult Correctional Facility.

(b)     When leaving the institutional grounds, inmates in this level must be escorted by a correctional personnel and kept in restraints.

(c)     Inmates should normally be housed in a single occupancy cell.

2.     Medium (Level 2)

(a)     This is a promotional level in this custody/security classification. Inmates in this level are actively participating in programs, work assignments, and activities within the perimeter of ACF.

(b)     When leaving the institutional grounds, inmates in this level shall be escorted by corrections personnel and may be in restraints.

3.     Medium (Level 3)

EO97-05/DOC
Rescind and Promulgate
    Chapter 4, EO94-19
    Classification of
    Inmates
Page  -5-



(a) This is the highest level in the medium custody/security classification. Inmates in this level are successfully participating in programs, work assignments, and activities inside the perimeter of ACF or within the boundaries of the Department.

(b) Supervision of inmates in this level should be less frequent, but there should be observation of the area the inmate is in.

D. Minimum (In)

1. This classification is for inmates who have met the time frame requirements as set by the Adjustment Classification Committee and approved by the Director.

2. Inmates in this classification have demonstrated positive behavior and attitude. However, they are not eligible to participate in any programs established by law or executive orders (i.e. work release, work credits, etc.) outside the department boundaries.

3. An inmate in this classification may be permitted to move about within the department's perimeter and does not need to be within the view of a corrections personnel.

4. Housing may be in an open unit within the department's boundaries.

E. Minimum (Out)

1. Inmates in this classification do not pose the risks associated with the preceding levels and are prepared for programs established by law or executive orders (i.e. work release, work credits, etc.) in the community shall be placed in this level.

2. This classification is the highest level for those inmates in Work Credits (other than a placement in Pre-Release Classification when recommended by the ACC and approved by the PSA and Director.

3. This is the entry level for those inmates meeting program eligibility criteria for community corrections.

4. An inmate in this level shall be permitted to move about in the department's perimeter and does not need to be within the view of a corrections personnel.

5. Housing may be in an open unit within the department's boundaries or in the community as designated by the Director.

J. Community Corrections

1. Only inmates eligible to participate in all programs established by law or executive orders (i.e. work release, work credits, etc.) and have consistently demonstrated satisfactory behavior and

EO97-05/DOC
Rescind and Promulgate
    Chapter 4, EO94-19
    Classification of
    Inmates
Page    -6-



attitude may be placed in this classification, and only after a classification in Minimum (Out) for not less than Twelve (12) months.

2.    An inmate's stay in this level shall normally be for not more than Three (3) years, is highly recommended prior to a full-time release or a release to parole supervision.

3.    The inmate may be allowed to be away from the center unescorted in accordance with program policies approved by the Director.

K.    Pre-Release

1.    Pre-release is reserved for inmates who are in Minimum (Out) or in the Community Corrections classification. These inmates are One Hundred Twenty (120) days from actual release from custody of the Director of Corrections. Candidates for the Pre-release shall be presented before the ACC at least Thirty (30) days before the One Hundred Twenty (120) days.

2.    Placement in this classification is for inmates who do not pose the risks associated with the preceding custody levels, and have consistently demonstrated trustworthiness. Inmates should not have a disciplinary case within Eighteen (18) months prior to a consideration to this level.

3.    The inmates may be allowed to be away from the center unescorted during the day in authorized programs and activities consistent with treatment and rehabilitation and considered extenuating in circumstances.

4.    This classification is set up to help develop the inmate's self-concept, confidence, and skills in preparation for successful community adjustment. Any outside privilege shall be in accordance with the requirements established by the extension of limits of confinement.

SECTION 4.6    CLASSIFICATION MODEL

(A)    Classification can only be done appropriately when quality information is available. It is essential that a pre-sentence investigation report or an admission investigation report be completed during intake for all inmates. Standardized interviews shall be administered during intake processing to provide compete and reliable data in which custody and program placements can be based.

(B)    Custody decisions should be based, where possible, on past relevant behavior. The frequency, recency, and severity of past behavior is the best indicator of future similar behavior. At intake, it may be necessary to consider other variables demonstrated to be correlated with institutional adjustment, e.g., age, employment history, etc., but at the time of classification review, measures of institutional behavior, e.g., disciplinary reports, should replace prior considerations.

EO97-05/DOC
Rescind and Promulgate
Chapter 4, EO94-19
Classification of
Inmates
Page -7-



(C)     Inmates should be classified to the least restrictive custody required
        to protect society, staff and other inmates.

(D)     Inmate needs should be assessed at intake and again during
        classification review. Program recommendations should be made
        based on inmate assessment and on program availability.

(E)     In exceptional cases not addressed by the standard classification
        criteria, the Director may assign the appropriate classification.

(F)     All classification documents shall be maintained in a centralized and
        secured location.

SECTION 4.9   INITIAL CLASSIFICATION

(A)     The Adjustment Classification Committee shall assess and
        determine the inmate's initial level of classification.

(B)     Initial classification of an inmate shall normally be completed during
        the initial Thirty (30) days, upon receipt of intake documents to
        include a judgment from the court, by the Corrections Social Worker,
        of the inmate's incarceration at the      Department. In exceptional
        cases (which must be documented) where circumstances and
        situations require an extension, the CSW Administrator by direction
        from the Director of Corrections, may extend the period beyond the
        Thirty (30) days, not to exceed Fifteen (15) additional days.

(C)     During the initial incarceration, the inmate is evaluated and will
        undergo a physical examination, initial interview, and is observed by
        corrections personnel. The social worker will complete an initial
        custody classification, initial assessment of needs, initial classification
        summary, and other data needed for planning, evaluation,
        monitoring or reporting purposes.

(D)     The inmate will be present at the initial classification hearing.

(E)     Some of the criteria used in determining initial classification are:

        (1)     History of departmental violence;
        (2)     Severity of current offense;
        (3)     Prior assaultive offense history;
        (4)     Escape history;
        (5)     Alcohol/drug abuse history;
        (6)     Current detainer(s);
        (7)     Prior felony convictions;
        (8)     Arrest records;
        (9)     Stability factors;
        (10)    Custody Classification criteria;
        (11)    Educational/Vocational needs;
        (12)    Health needs;
        (13)    Psychological/psychiatric problems;
        (14)    Work assignments;
        (15)    Specialized assistance/placement.

SECTION 4.10   ADJUSTMENT CLASSIFICATION COMMITTEE

EO97-05/DOC
Rescind and Promulgate
    Chapter 4, EO94-19
    Classification of
    Inmates
Page  -8-



(A)     The Adjustment Classification Committee (ACC) shall convene to
        address, review and decide on the custody and program needs of the
        inmates.   The ACC will be composed of corrections personnel
        appointed by the Director. The ACC may also convene at the request
        of the division administrators or the Director.

(B)     The following shall serve as a guideline for the ACC as some of the
        criteria used in determining inmate reviews:

        (1)     History of departmental violence;
        (2)     Severity of current offense;
        (3)     Prior assaultive offense history;
        (4)     Escape history;
        (5)     Alcohol/drug abuse history;
        (6)     Current detainer(s);
        (7)     Prior felony convictions;
        (8)     Arrest record;
        (9)     Stability factors;
        (10)    Educational/Vocational needs;
        (11)    Health needs;
        (12)    Psychological/psychiatric problems;
        (13)    Work Assignments;
        (14)    Specialized assistance/placement;
        (15)    Time Frame requirements
        (16)    Past Departmental Disciplinary Hearings

(C)     The ACC should also consider and place emphasis upon:

        (1)     Institutional adjustments;
        (2)     Work and skill performance;
        (3)     Interpersonal communications;
        (4)     Positive self-esteem;
        (5)     Problem solving techniques;
        (6)     Realistic goal setting;
        (7)     Education and training.

(D)     The ACC shall have input from each inmate's work supervisor,
        program supervisor, custodial staff, caseworker, etc.   These are
        typically gathered from evaluations done periodically on each
        inmate.   The officer in charge of each shift shall review and
        summarize these evaluations for presentation to the ACC.   Case
        presentations before the ACC will be made by the corrections social
        worker assigned to the inmate's case by the CSW Administrator.

(E)     The ACC's recommendations shall be forwarded to the Prison
        Security Administrator for action.

(F)     The classification review hearing does not necessarily imply a change
        in the inmate's custody, programming, or work assignment. Rather,
        it should serve as a way to monitor the inmate's progress and bring
        attention to problems that may arise. With continual review and
        monitoring of an inmate's progress as part of the classification
        process, the ACC can make appropriate recommendations
        concerning basic program changes such as:

EO97-05/DOC
Rescind and Promulgate
    Chapter 4, EO94-19
    Classification of
    Inmates
Page -9-



(1) Special departmental treatment-oriented program assignment.
(2) Assignment and coordination to departmental Work Assignments.
(3) Vocational and academic program assignment.
(4) May reclassify an inmate, for cause, for adjustment purposes.

SECTION 4.11 REVIEW SCHEDULE

The inmate will be given notice not less than Twenty-four (24) hours prior to the hearing before the ACC. The inmate may waive, in writing, the waiting period of appearance before the committee. Reviews may normally be scheduled by the ACC according to the following:

(A) Within Three (3) weeks of an inmate's assignment to a unit;
(B) At least once every Three (3) to Five (5) months for inmates serving terms of less than Eighteen (18) months;
(C) At least once every Six (6) to Seven (7) months for inmates serving terms of Eighteen (18) months to less than Five (5) years;
(D) At least once every Eight (8) to Nine (9) months for inmates serving terms of Five (5) years to less than Ten (10) years;
(E) At least once every Ten (10) to Eleven (11) months for inmates serving terms of Ten (10) years or more.
(F) The ACC may also hear request via letter or Remedy Request Form for any other purpose outside the regular institutional review. The ACC after reviewing special request may set a new review schedule."

SIGNED AND PROMULGATED at Agana, Guam this 22th day of February, 1997.

CARL T. C. GUTIERREZ
Governor of Guam

COUNTERSIGNED:

MADELEINE Z. BORDALLO
Lieutenant Governor of Guam